**UNITED STATES, Appellant,**

v.

**Rufus BROWN et al.**

**No. 24452.**

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc March 8, 1971.

Decided March 15, 1971.

Opinions Filed March 1, 1972.

Mr. Robert J. Higgins, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and Robert A. Shuker, Asst. U. S. Attys., were on the brief, for appellant.

Mrs. Carol Garfiel Freeman, Washington, D. C., with whom Mr. James B. Blinkoff, Washington, D. C. (both appointed by the District Court) was on the brief, for appellee Brown, argued for all appellees.

Mr. Jerome J. Dick, Washington, D. C. (appointed by this court) as amicus curiae.

Messrs. Ira M. Lowe and Eugene P. Hines, Washington, D. C. (both appointed by the District Court) were on the brief for appellee Proctor.

Mr. Sol Z. Rosen, Washington, D. C. (appointed by the District Court) was on the brief for appellee Williams.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVROBB, and WILKEY, Circuit Judges, ENTHAL, ROBINSON, MacKINNON, sitting *en banc*.

WILKEY, Circuit Judge:

This is an appeal by the Government under 18 U.S.C. § 3731 from an order of the District Court suppressing "any photographic or in-court identification of the defendants Rufus Brown and Paul Proctor by Mrs. Barbara Edgecomb" at the trial. The case was initially argued before a three-judge panel of this court. We subsequently ordered *sua sponte* that the case be set down for argument and decision *en banc*. Finding the action of the trial court erroneous, we have vacated the order of the District Court and remanded the case for trial.

I. *Facts and Proceedings Made the Basis of the District Court Order*

A. *The Offense*

According to the evidence given at the suppression hearing, on 27 June 1969 two armed men, identified by eyewitnesses as appellees Proctor and Brown, robbed a Washington liquor store. During the course of the robbery the retired store owner, Israel Burka, arose from where he had been seated and took a few steps. Without uttering a word, Proctor allegedly shot Burka in the back. According to the Government's evidence, while Burka lay face down on the floor in a large pool of blood, Brown forced the store manager to open the safe, and Proctor herded customers and clerks behind a counter.

As Mrs. Barbara Edgecomb, a customer who was the first to file behind the counter, stopped next to the fatally wounded Burka, she bent down to help him. As she looked up, the robber (identified as Proctor) who had fired the bullet into Burka's back was "right there," only three and a half feet away. Mrs. Edgecomb had other opportunities to observe both robbers at varying distances during the seven to eight minutes the robbery consumed. One hour later Burka was dead.

B. *The Lineup*

By October 1969 the police had information that appellees Proctor and Brown had robbed the liquor store, and that appellee Williams had driven the getaway car. Proctor was quoted as saying that he had "shot an old man." After arrest, in a lineup on 4 November 1969 two witnesses identified Proctor and Brown as the gunmen.

At the lineup Proctor was represented by the same counsel who later appeared for him at the pre-trial hearing and on this appeal. Brown was also represented by counsel at the lineup; different counsel were subsequently appointed for him and have represented him at the pretrial hearing and on appeal.

Brown does not claim that the lineup was unfair; Proctor contends it was. At the lineup the only objection clearly made by any counsel was that the defendants were brought there by an illegal arrest, an issue which is not before us on this appeal. In argument before the three-judge panel counsel for both sides agreed that the record is unclear whether Proctor's counsel objected to the lineup on the grounds that Proctor was the only one of the nine persons who had a goatee. It is agreed that the witnesses at the lineup gave no indication that Proctor was in any way unique. In the lineup picture which we have in the record, it appears that the man next to Proctor has a mustache and goatee, as does Proctor. Six of the nine appear to have mustaches of varying density and style.

Appellees' counsel on appeal agreed that, without the lineup photo having been shown to Mrs. Edgecomb, her testi-

mony would be admissible at trial for whatever weight the jury chose to give it.

## C. *The Witness Edgecomb*

In the pre-trial hearing Mrs. Edgecomb described the gunmen as she saw them at the time of the killing, and was able to give a very detailed description of both men. She said the light in the liquor store was fairly good, that there was no trouble with the light at all. She saw Brown for about three minutes, at times as close as four feet.[1] Proctor she remembered specially when she was standing next to the head of the fallen Burka while Proctor hovered over Burka's feet.[2] Immediately after the killing she and her husband went to the police building, saw a great number of pictures, but were unable to identify either of the two gunmen; nor were they able to do so on three other occasions when shown other photographs by the police.[3]

After the robbery was over Mrs. Edgecomb did not talk to her husband about what the gunmen looked like, "because we wanted to forget about it at that time." While riding to the lineup on 4 November 1969, Mrs. Edgecomb told her husband that she thought she would know the robbers again. However, when she viewed the lineup, she was unable to identify anyone under the lights, which "just made people's faces look like blobs." Particularly she could not tell differing complexions. Under the lighting conditions she felt that she could not "fairly say for sure."

On the way out of the police headquarters Mrs. Edgecomb did say to one of the policemen, "I wasn't sure about a certain person in the lineup, but that I wouldn't say yes for sure, that I'd like to see the lineup pictures." On 19 May 1970, about two weeks prior to the scheduled trial, Mrs. Edgecomb came to the office of the prosecutor who was to try the case. In the course of the pretrial interview of the witness, he said, "You wanted to see the picture of the lineup, here it is." Mrs. Edgecomb, without being asked or instructed, in the presence of the prosecutor and a detective of the homicide squad (her husband was outside the office), picked up the lineup photograph and systematically went down the line, reading from left to right. Originally she focused on Proctor; then she "liked" Proctor, Brown, and the man on the left end next to Proctor (with mustache and goatee); and finally she chose Proctor and then Brown as the two robbers. Originally Mrs. Edgecomb had described Proctor at the time of the killing as having "the beginnings of a mustache and a goatee-type beard." On seeing the lineup picture, she commented that the growth of his beard was different, that it was fuller in the lineup picture than at the time of the robbery.

## D. *The Trial Judge's Suppression Order*

The trial judge ruled that the 4 November 1969 lineup was properly conducted and that two other witnesses, liquor store employees, could testify as to their lineup identification and make whatever in-court identification they could. As to Mrs. Edgecomb,

---

1. She described Brown as a tallish man; slender; a long face, with a long cheekbone to the jawline, high forehead; lightish complexion; hair cut shortish, not an Afro cut but beginning to fill, about an inch and a half long; wearing a greenish shirt with long sleeves, kind of a checkish thing; wearing grayish or tan slacks.

2. According to Mrs. Edgecomb's description, Proctor had a heart-shaped face; medium dark complexion; about 5'11" in height; high cheekbones, accentuated cheekbones; wearing a burgundy-maroonish kind of shirt, and his sleeves weren't short. "He had the beginnings of a mustache and a goatee-type beard." His eyes were "lazy," with heavy lids, well-shaped brows, hair about an inch and a half in length.

3. It was only on the latter two of these occasions, 25 and 26 October 1969, that pictures of Brown and Proctor were included in the groups of photographs viewed. See *infra*, pp. 146–147.

However, the Court feels that in view of the fact that she did not pick out the people at the time of the line-up, and with an abundance of caution on behalf of the defendants, the Court will deny the use of her identification of the defendants in the photograph at a later time.

The court further added,

In view of the fact that the photographic identification is excluded the Court feels that she should not make an in-court identification of the defendants at the time of her appearance here in fear it might be tainted in some way by the recent viewing of the photograph.

Although the trial court did not mention the Fifth or Sixth Amendment in making her suppression ruling, foot-noted *in toto* and sequentially below,[4] nor did she make a specific finding as to any independent source, it appears that the District Judge's ruling is relevant in the following manner to the two points alleged to be at issue on this appeal:

1. Appellees' Sixth Amendment claim under the doctrine of United States v. Wade[5] that representation by counsel was denied at a critical stage:

a. "It is felt that since this was after the lineup and close to the trial that it would have perhaps been better if counsel had been present at the time."

b. "I think that if they had been present there would have been no question about it."

c. "But there is always a question in their minds, defense counsel's

---

4. The trial court's opinion, delivered orally from the bench, together with the inquiries of counsel with respect thereto, appear in the record as follows:

THE COURT: The Court has taken under advisement the question of the identification by Mrs. Edgecomb.

It appears that Mrs. Edgecomb did have an ample opportunity to observe the two defendants while in the store.

However, the Court feels that in view of the fact that she did not pick out the people at the time of the lineup, and with an abundance of caution on behalf of the defendants, the Court will deny the use of her identification of the defendants in the photograph at a later time.

There is no question in the Court's mind that there was nothing improper insofar as her having seen the photograph in [the prosecutor's] office.

However, it is felt that since this was after the lineup and close to the trial that it would have perhaps been better if counsel had been present at the time.

In view of the fact that the photographic identification is excluded the Court feels that she should not make an in-court identification of the defendants at the time of her appearance here in fear it might be tainted in some way by the recent viewing of the photograph.

[DEFENSE COUNSEL]: Thank you, Your Honor.

[THE PROSECUTOR]: Is it Your Honor's ruling then that there is some taint in the viewing of the photograph?

THE COURT: Just with an abundance of caution insofar as the defendants are concerned.

The court feels if there is any question that it should be resolved in favor of the defendants and, therefore, that is the reason for the Court's ruling.

In view of the fact that she had seen photographs over a period of time and not made the identification before or at the lineup of the defendants the Court feels that the later identification just might be subject to question.

[THE PROSECUTOR]: As I understand it, Your Honor had stated that there was ample opportunity for her to observe but that it was the Court's feeling that counsel should have been present when she viewed the photograph of the lineup?

THE COURT: I think that if they had been present there would have been no question about it.

I don't feel there was anything at all improper about counsel's having shown her the photograph or actually her looking it over but there is always a question in their minds, defense counsels' minds, as to just exactly what did happen at that time when she had not been able to determine prior thereto.

5. 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed. 2d 1149 (1967).

minds, as to just exactly what did happen at that time when she had not been able to determine prior thereto."

2. Appellees' Fifth Amendment claim of denial of due process on the grounds that the procedures followed were "so unnecessarily suggestive and conducive to irreparable mistaken identification," and the existence or non-existence of any independent source for the in-court identification:

a. "It appears that Mrs. Edgecomb did have an ample opportunity to observe the two defendants while in the store."

b. "However, the Court feels that in view of the fact that she did not pick out the people at the time of the lineup, and with an abundance of caution on behalf of the defendants, the Court will deny the use of her identification of the defendants in the photograph at a later time."

c. "There is no question in the Court's mind that there was nothing improper insofar as her having seen the photograph in Mr. Shuker's office."

d. "In view of the fact that the photographic identification is excluded the Court feels that she should not make an in-court identification of the defendant at the time of her appearance here in fear it might be tainted in some way by the recent viewing of the photograph."

e. "In view of the fact that she had seen photographs over a period of time and not made the identification before or at the lineup of the defendants the Court feels that the later identification [of lineup photo] just might be subject to question."

f. "I don't feel there was anything at all improper about counsel's having shown her the photograph or actually her looking it over."

Although the appellees have briefed and argued a Fifth Amendment due process justification for suppression of any in-court identification by Mrs. Edgecomb, the Government contends that an analysis of what District Judge Green said gives absolutely no support to forbidding photographic or in-court identification on Stovall [6] due process grounds, that the trial court clearly ruled that the display of the lineup photograph was itself proper, that the trial court impliedly found an independent source for the witness' identification at trial, and that the trial judge's rationale for suppression was simply the absence of defendants' counsel at the viewing of the lineup photograph, which is a Sixth Amendment ground under the rationale of Wade.

II. The Sixth Amendment Right to Counsel in Relation to a Witness' Post-Indictment Photographic Identification of a Defendant

A. The Photograph in Question

At the outset we note the following:

1. Counsel for both appellees Proctor and Brown were present at the lineup reproduced in the photograph shown to Mrs. Edgecomb.

2. We find no fault or unfairness in this lineup, judging from the picture itself and the testimony concerning it. Neither did the District Court. Brown even now makes no claim of unfairness. On the record it is agreed by both sides that it is unclear whether Proctor's counsel, the same at the lineup as on this appeal, made any allegation that Proctor was the only one with a goatee; it appears in the photograph that the first man on the left, standing next to Proctor, does also have a mustache and goatee. Proctor's only claim to unfairness in the lineup is a possible absence of sufficient goatees.

3. The lineup being fair, the photograph itself provides a fair comparison of nine persons from which Mrs. Edgecomb or any other witness at the robbery could make an identification.

6. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

4. The reason Mrs. Edgecomb did not make an identification at the lineup was plainly and clearly stated at the time to those present, i.e., all of the faces, their shapes and complexions, were equally indistinct to her because of the lighting, and she could not fairly make any kind of choice. We take this reluctance to make an identification under these conditions, not as any indication of Mrs. Edgecomb's uncertainty or lack of ability to make an identification under different conditions, but as an indication of Mrs. Edgecomb's desire to be fair and accurate.

5. The witness herself requested, at the time she was leaving the lineup, to see a photograph of the lineup, because she believed she might be able to make an identification of at least one person from a photograph.

6. The Government complied with this request, not immediately after the lineup, but some seven months later, two weeks immediately prior to trial, as part of its preparation for trial by interviewing the witnesses as to their prospective testimony.

7. The witness herself initiated the discussion of the lineup photograph, without any prompting from the prosecutor or the detective present. She first picked out Proctor as she went down the lineup from left to right, then picked Brown and one other standing next to Proctor (also with mustache and goatee), then finally settled on Proctor and Brown as the two robbers.

## B. The Authorities

Whatever might be said of another post-custodial photographic identification with a type photo or photos different from that we have in the case at bar, there is little in the rationale of

*Wade* which supports the trial judge's action or appellees' position here. Throughout Part IV of the majority opinion in *Wade* there runs a two-factor rationale for the required presence of counsel at a lineup:

A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.[7]

And,

There is serious difficulty in depicting what transpires at lineups and other forms of identification confrontations. . . . The defense can seldom reconstruct the manner and mode of lineup identification for judge or jury at trial.[8]

From this Justice Brennan's opinion concluded:

Since it appears that there is grave potential for prejudice, intentional or not, in the pre-trial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was "as much entitled to such aid [of counsel] . . . as at the trial itself." [9]

However, prior to the enunciation of this rationale for right to counsel at lineups in *Wade*, the Supreme Court in Part III of its opinion had considered other pre-trial preparatory techniques, and concluded that these were different from the lineup. The Government had urged that the lineup was a mere preparatory step, not different for Sixth Amendment purposes from various oth-

7. 388 U.S. 218, 228, 87 S.Ct. 1926, 1933.

8. *Id.* at 230, 87 S.Ct. at 1934.

9. *Id.* at 236–237, 87 S.Ct. at 1937.

er actions, such as scientific analysis of fingerprints, blood samples, clothing, hair, and the like. The Court said:

> We think there are differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses in the presentation of the evidence of its own experts. The denial of a right to have his counsel present at such analysis does not therefore violate the Sixth Amendment; *they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate his right to a fair trial.*[10] (Emphasis supplied.)

■ Obviously the pre-trial photo identification here is not similar to the scientific tests cited by the Court as examples of investigative steps, but we think the same reasoning—"there is minimal risk that his counsel's absence at such stages might derogate his right to a fair trial"—applies. Since appellants were represented at the lineup by counsel, the lineup itself met the Sixth Amendment requirements of *Wade*. The photograph of that lineup is a completely neutral and wholly exact reproduction.[11] As for the possibility of manipulation by the prosecuting attor-

ney in the showing of the photograph to the witness, we do not think the risk of impeding justice is such—considering the professional responsibilities and status of the prosecuting attorney, and the defense counsel's right of cross-examination—as to require that this phase of preparation for trial by the busy prosecuting attorney be encumbered with attendance by defense counsel who has already attended the identification lineup recorded in the photograph.

There are many different kinds of photographs, and a wide variety of circumstances in which the validity of their use for criminal identification purposes may arise. The case before us involves a very special kind of photograph and a very special set of circumstances giving rise to its exhibition to the witness. To hold that there was no Sixth Amendment violation in this case, we need not, as some courts apparently have, embrace a general principle to the effect that no photographic showing can ever fall afoul of the Sixth Amendment for the reason that the right to counsel attaches only to confrontations, and confrontations by definition involve the presence of the accused.[12]

In the case before us there was a confrontation with counsel present. That was the lineup. All we have to decide is whether the subsequent showing of a photograph of that lineup to the witness occurred under circumstances necessitating the presence of counsel. This record shows no such need. Since defense counsel was present at the lineup, the lineup array was fair, and the picture was of the lineup itself, there is thus

---

10. *Id.* at 227–228, 87 S.Ct. at 1932.

11. The dissenting judges accuse us of missing the thrust of *Wade*, in that we do not believe that the *Wade* rationale of the difficulty of reconstruction at trial of the "precise manner and mode of lineup identification" applies to a pre-trial photographic identification, such as we have here. We are of this belief because we do not feel that a pre-trial photographic identification as in this case presents

as many elements difficult of reconstruction as does the "little drama" of a lineup itself. See the writer's dissenting opinion in United States v. Ash, 149 U.S. App.D.C. ——, ——, 461 F.2d 92, 106 (No. 22,340, decided this day).

12. See the extensive discussion of these cases by both the majority and dissenting opinions in United States v. Ash, No. 22,340, 149 U.S.App.D.C. ——, 461 F.2d 92 decided this day.

preserved for reconstruction at trial most of the factors which the Supreme Court in *Wade* felt required the presence of counsel, even by appellees' definition.[13] As for the manner in which the photograph was presented to the witness, all three persons present were subjected to vigorous cross-examination, and no hint of suggestivity or unfairness in the presentation on the part of the prosecution was elicited.[14] Having had the benefit of this pre-trial hearing, defense counsel is now thoroughly prepared for cross-examination on this pre-trial photographic identification.[15] The rationale of *Wade*[16] has no application here.

13. "The underpinnings of the *Wade* holding are twofold: First, that the presence of defense counsel may prevent unfairness in the lineup array itself and in the circumstances under which the witnesses view the suspects, and therefore may avert an erroneous identification; and, second, that counsel will be better equipped to cross examine the identifying witnesses at trial because he has been able to observe the identification proceeding and is thus aware of many of the factors relevant to the validity of the identification." Appellees' brief, 24.

14. The dissenters would favor the presence of counsel at pre-trial identifications such as the one in the case at bar in order to guard against prosecutorial bad faith, or even "wholly unintentional nuances which may suggest the 'proper' response." As to the latter, we are far from sure that the presence of counsel can counter or hold in check the unconscious responses of the prosecutor, and as for the problem of "bad faith," while we believe such instances to be very rare, we are certain that an accomplished and hardened prosecutor fatally bent on mischief could easily sway a witness through a hundred subtle or not-so-subtle means. For example, it would be comparatively easy in a lineup or photographic identification for the prosecution to let a witness know in advance the identification numbers that would be assigned to a defendant the prosecution wished to convict. A counsel present at such a "rigged" identification would have no way of knowing of such a "fix," and his presence would serve as no deterrent. The protection of defense counsel would lie in vigorous cross-examination of the witness, whether counsel

III. *The Fifth Amendment Claim of Denial of Due Process in the Identification Procedure*

A. *Suppression of the Pre-Trial Photo Identification*

1. *The District Court's Ruling*

Among other reasons for suppressing Mrs. Edgecomb's identification of the lineup photo, the trial judge enunciated two which did not relate to denial of counsel: First, that she did not pick the people out at the time of the lineup; and, second, that she had seen photographs over a period of time and had not identified the two defendants in them.[17] This might appear that the

had been present or not. Thus we feel that the possibility of prosecutorial bad faith has little relevance to the problem at hand.

15. The dissenting judges criticize our decision in light of what they see as the great difficulty of reconstruction of the photographic identification at trial, as this difficulty "is substantially greater than an uncounselled lineup, for at least the accused is present at the lineup and can relate what occurred there to his attorney." (at p. 150.) It should be pointed out that in the lastest police procedures, for instance now in the District, the goal at lineups is to make it impossible for the accused to see the identification procedures, lest there be reprisals against identifying witnesses. Various devices are used to implement this policy, with perhaps the most effective being that used by the Washington police, a one-way mirror behind which the men in the lineup stand, where they may be viewed by witnesses, but may not see them. Furthermore, the comments of witnesses are not audible on the other side of the glass section, and the only communication between the two areas is by telephone ·between the officer with the witnesses and the officer in control of the subjects in the lineup.

16. See particularly, 388 U.S., at 231–232, 240–241, 87 S.Ct. 1926.

17. As quoted under 2b, *supra* p. 8:
[I]n view of the fact that she did not pick out the people at the time of the lineup, and with an abundance of caution on behalf of the defendants, the court will deny the use of her identification of the defendants in the photograph at a later time.

court was stating a Fifth Amendment ground for suppression of the pre-trial photo identification. But, before the first statement, between the two statements, and after the second, the trial judge made a finding of fact—"It appears that Mrs. Edgecomb did have an ample opportunity to observe the two defendants while in the store" (2a, *supra*) —and conclusions of law—"There is no question in the court's mind that there was nothing improper insofar as her having seen the photograph in Mr. Shuker's office" (2c, *supra*), and "I don't feel there was anything at all improper about counsel's having shown her the photograph or actually her looking it over" (2f, *supra*)—which completely negate any due process violation.

■ We conclude that the trial court's ruling really rested unambiguously on Sixth Amendment grounds, but whether or not the trial court relied on a Fifth Amendment rationale, there is nothing in the record to support such reliance. The photograph depicted a lineup, which we and the trial court have found to be fair, during which appellees were represented by counsel. Mrs. Edgecomb and Detective Pierson were vigorously cross-examined regarding the 19 May interview, and there is nothing in the record which hints at anything in any way suggestive concerning the manner in which the photograph was presented to Mrs. Edgecomb or any other actions taken to influence Mrs. Edgecomb's testimony.

### 2. *Appellees' Position*

Appellees' brief makes a Fifth Amendment denial of due process argument as justification for the trial court's suppression of Mrs. Edgecomb's pre-trial photographic identification.

In support of this argument, appellees recite and dwell at length upon the times at which Mrs. Edgecomb did not make an identification of Proctor and Brown. Specifically, on 25 October 1969, when shown ten photographs including both Proctor and Brown, she was unable to identify anyone. On 26 October 1969, she was shown eight photographs, including Proctor and Brown, out of which she "liked" Brown and one other not involved in the crime, but was not at all certain. On 4 November 1969 at the lineup, already discussed in detail, she made no identification, in fact no attempt to pick out anyone because of the reasons previously stated. She did, however, ask for a photograph of this lineup, because she felt that without the glaring lights, the attendant confusion, and the nearby presence of suspected criminals she might identify at least one person in that lineup. On 19 May 1970 she was shown this photograph, and without any suggestion whatsoever proceeded in her own way to identify both Proctor and Brown. Appellees also cite Mrs. Edgecomb's reluctance to talk about the crime with her husband or anyone else as an indication of uncertainty in her identification.

### 3. *Testimony as to Pre-trial Photographic Identification Admissible*

■ Appellees interpret Mrs. Edgecomb's hesitancy in firmly identifying the two perpetrators of this murder and robbery as implying a lack of accuracy in her identification and as justifying invalidating her subsequent identification. Neither conclusion is correct. Mrs. Edgecomb's testimony is replete with indications of her awareness of the seriousness of the crime, and of the seriousness of her identification of anyone perpetrating murder. We interpret her hesitancy as the hesitancy of the responsible citizen knowingly performing an important act. It has been frequently observed that, sad to relate, the more glib and self-assured witness sometimes makes a stronger impression on an unso-

And under 2e, *supra* p. 9 :
    In view of the fact that she had seen photographs over a period of time and not made the identification before or at

the lineup of the defendants the Court feels that the later identification [of lineup photo] just might be subject to question.

phisticated jury than does a careful and conscientious witness, who registered fairly his certainties and uncertainties on different aspects of his testimony. The appellees urge us to draw the same false conclusion, *i. e.,* take the conscientious effort of Mrs. Edgecomb to be absolutely fair and careful in her identification as the mark of an unreliable or influenced witness, when in fact it is probably the mark of reliability and independence of judgment.

It is significant that the photos shown to the witness in October, allegedly of Brown and Proctor, do not at all resemble the appellees as they appear in the lineup photo. In reliance on both briefs' statement that Proctor's photo was included in each group, we believe Proctor is identifiable in two individual photos, one in each group shown. (Mrs. Edgecomb was *not* told a definite suspect was in either group, and had twice previously been shown many photos in which Brown and Proctor were not included; she made no identification on either occasion.) As for Brown, there appears one photo in each group that is *similar* to Brown's picture in the lineup, but these two individual photos appear to be of two *different* men.

We draw these conclusions: First, that it is thoroughly understandable why Mrs. Edgecomb made no identification of Brown and Proctor from the individual photos shown her in October. Second, we conclude that neither her identification of Brown and Proctor in the lineup photograph nor her possible identification of the appellees at trial was or would be "tainted" by viewing the individual photos; rather, such identification would be made in spite of such viewing. It follows that appellees' due process violation argument based on repeated showings of photographs of the accused to the witness—on the facts of this case—is not sustainable. And, third, it appears that Mrs. Edgecomb did

have an ample opportunity to observe the two defendants while in the store.

To whatever extent the argument about Mrs. Edgecomb's hesitancy in making her identification of Proctor and Brown has validity or affects the strength of her testimony, it is an argument which appellees can make to a jury. But it is not a valid due process argument for suppressing her identification of the lineup photograph.

■ In considering the admissibility of identification evidence at trial, constitutional infirmities will bar its admission, but testimonial infirmities go only to the weight of the evidence. We start with the principle, well phrased by Judge (now Chief Justice) Burger in a different context but thoroughly applicable here: "When an eyewitness is willing to give testimony, under oath and subject to all the rigors of cross-examination and penalties of perjury, he must be heard."[18]

B. *Suppression of the In-Court Identification*

1. *The District Court's Ruling*

The only ground advanced by the trial judge for her suppression of the prospective in-court testimony of Mrs. Edgecomb was:

> In view of the fact that the photographic identification is excluded the Court feels that she should not make an in-court identification of the defendants at the time of her appearance here in fear it might be tainted in some way by the recent viewing of the photograph. (2d, *supra*)

■■ Of course, if a pre-trial identification is found to have been obtained in violation of the accused's Fifth or Sixth Amendment rights, the burden is then on the Government to show an "independent source" for any subsequent identification made at trial.[19] A find-

18. Brown v. United States, 126 U.S.App. D.C. 134, 375 F.2d 310, at 319 (1966).

19. United States v. Wade, 388 U.S. 218, 240–242, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968)

ing that this burden was not met may be inferred from the District Judge's statement quoted above. The opposite can also be inferred from what the District Judge plainly stated at the outset, "It appears that Mrs. Edgecomb did have an ample opportunity to observe the two defendants while in the store," that Mrs. Edgecomb did have an independent source for in-trial identification.

## 2. *Appellees' Position*

At oral argument appellees' counsel conceded that, without the display of the lineup photograph, Mrs. Edgecomb's testimony would be admissible at trial, for whatever weight the jury might give it.[20]

## 3. *In-Trial Identification Permissible*

On the whole record of the pre-trial hearing, evaluating Mrs. Edgecomb's opportunity to observe at the time of the robbery and murder, the comparative clarity of the lineup photograph and the individual photographs of the accused shown the witness, her care, selectivity and spontaniety in making the identifications in the lineup photograph which she did (coupled with the previous refusal to identify in the other photos), we conclude that the witness Edgecomb had an independent source from which she

may attempt an in-court identification of the accused at trial.[21]

We have found that there were no Sixth Amendment right to counsel nor Fifth Amendment due process violations involved in the showing of the lineup photograph to Mrs. Edgecomb. It therefore follows that no showing of an "independent source" is required, although the trial court may be considered to have determined an independent source and on the record we have so determined; hence, any in-court identification by Mrs. Edgecomb will be properly admissible at trial.

Reversed and remanded.

BAZELON, Chief Judge, concurring in No. 22,340 United States v. Ash, 149 U.S.App.D.C. ——, 461 F.2d 92 and dissenting in No. 24,452 United States v. Brown, Proctor & Williams: Given the complex entanglement of our holding in these cases it is distressingly easy to lose sight of the straightforward propositions on which our decisions should rest. First, identifications are crucial to the fairness and reliability of convictions. No other aspect of the accusatory process creates so much opportunity for miscarriage of justice—for punishment of an innocent man.[1] Second, the safeguard at issue

---

*(en banc)*, cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). United States v. Cunningham, 423 F.2d 1269 (4th Cir. 1970).

20. At oral argument before the panel the following exchange occurred:

THE COURT: Minus the lineup photograph then you would say that, for whatever it's worth, Mrs. Edgecomb could testify in court?

COUNSEL FOR APPELLEES: It was Judge Green's finding that it was the lineup photograph that did it.

21. The accused were carefully sequestered from the courtroom while Mrs. Edgecomb was present. She has yet had no opportunity for an in-court identification, and may or may not be able to do so.

1. Of course, not all of the problems connected with identifications can be fully cured by requiring the presence of counsel. One critical problem concerns their

reliability, yet courts regularly protest a lack of interest in the reliability of identifications, as opposed to the suggestivity that may have prompted them, arguing that reliability is simply a question of fact for the jury. *See, e. g.*, majority opinion in *Brown, Proctor & Williams* at —— of 149 U.S.App.D.C., at 144 of 461 F.2d. There already exists, however, great doubts—if not firm evidence—about the adequacy and accuracy of the process. Unquestionably, identifications are often unreliable—perhaps consistently less reliable than lie detector tests, which we have in the past excluded for unreliability. *See* Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (1923); 3A J. Wigmore, Evidence § 999 at n. 2 (Chadbourn rev. 1970). The difference between our approach to polygraph tests and to identifications is, no doubt, attributable at least in part to the perceived differences in our need for the information. We have no diffi-

here obviously cannot be subjected to the attack so often leveled at judicial efforts to enforce the Constitution. Even if the convenience of the police were a controlling consideration, by no stretch of the imagination could this safeguard tie their hands or make the apprehension and conviction of criminals more difficult. If the Court were to hold that counsel must be present at *all* photographic identifications which take place after arrest, even the most zealous critic could not reasonably argue that law enforcement would be hindered.[2]

In fact, the only argument against this safeguard is a vague suggestion that

it would be bothersome for the police to telephone the defense attorney and to postpone the identification until he or his designee arrives. Considering the interests of the defendant and the very real possibility that an innocent man will be convicted on the basis of a mistaken identification, I am distressed by the failure to recognize an unambiguous constitutional requirement that counsel must be present at all post-arrest photographic identifications.

Recognizing that a post-arrest photographic identification is a "poor substitute for a corporeal lineup," the Court holds in *Ash* that such an identification

culty conceiving of a criminal process that operates without the aid of lie detectors, even if we assume that lie detectors might in some instances enhance the process. But it is hard to see how the process could operate without identifications, and we have bravely assumed that the jury is capable of evaluating their reliability.

Even accepting the validity of that balancing approach, it seems to me clear that we need more information about the reliability of the identification process and about the jury's ability to cope with its responsibility. For it should be obvious that we cannot strike a reasonable and intelligent balance if we take pains to remain in ignorance of the pitfalls of the identification process. The empirical data now available indicates that the problem is far from fanciful. *See generally* P. Wall, Eye-Witness Identification in Criminal Cases (1965); I. Hunter, Memory 169–175 (1964); H. Munsterberg, On the Witness Stand 39–69 (1908); R. Yin, Face Recognition: A Special Process? 35–71 (1970) (unpublished dissertation submitted to the Department of Psychology, Massachusetts Institute of Technology). But for a variety of reasons we have been unwilling to face up to the doubts to which this data gives rise. And despite repeated charges and counter-charges concerning the accuracy of inter-racial identifications, we have developed a reluctance that is almost a taboo, *cf.* People v. Hearns, 18 App.Div.2d 922, 923, 238 N.Y.S.2d 173, 174–175 (2d Dept.1963), against even acknowledging the question, much less providing the jury with all of the available information. The data on this point is unfortunately meager, but it offers at least tentative support for the widely-held, common sense view

that whites have greater difficulty identifying blacks than identifying other whites. And it also seems true that blacks can identify other blacks more easily than they can identify whites. *See* P. Wall, *supra*, 122–125; Malpass & Kravitz, Recognition for Faces of Own and Other Race, 13 J. Personality & Social Psychology 330 (1969); Feingold, The Influence of Environment on Identification of Persons and Things, 5 J.Crim.L., C. & P.S. 39, 50 (1914); *cf.* Seeleman, The Influence of Attitude Upon the Remembering of Pictorial Material, Archives of Psychology No. 258, at 61 (1940) ("Unfavorable attitude toward the Negro tended to obliterate recognition of individual differences among Negro pictures, whereas favorable attitude tended to heighten recognition of these differences."). More information is needed to assist the jury's resolution of identification issues, and that information may reveal that in some instances questions of reliability should be resolved by courts as threshold questions of law. In any case, our doubts will not disappear merely because we run away from the problem.

2. Assuming it were clear that the convenience of the police could be raised in opposition to a claim of constitutional right, the appropriate course would be to remand the case to the District Court for an inquiry into the extent, if any, of the inconvenience that would be imposed. Nothing in the record before us even begins to indicate that this constitutional requirement of counsel would impose any discernible burden on the police or prosecution. *Cf.* United States v. Wade, 388 U.S. 218, 237, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

is a critical stage of the prosecution at which the presence of counsel is required. But the Court explicitly points out that "[w]e do not consider in this opinion whether or to what extent [the principle of *Ash*] should be applicable in case of a photographic showing subsequent to a lineup." [3]

By means of this limitation, the opinion in *Ash* leaves room for the decision in *Brown*, where the Court validates an uncounselled identification at which the witness was shown a photograph of a prior lineup. Yet in neither opinion does the Court convincingly explain why a photographic identification ceases to be a critical stage of the prosecution merely because it comes on the heels of a corporeal lineup. There are, of course, differences between *Ash* and *Brown*. But whether those differences amount to a meaningful distinction is a question answered conclusively in the negative by Judge Wright's dissenting opinion, which I join, in *Brown*.

According to the Court's opinion in *Ash*, the premise of *Brown* is that prosecuting attorneys, given their professional responsibilities and fears of jeopardizing their professional careers, are so unlikely to steer identifications that we should not impose on their busy schedules by requiring the presence of defense counsel at identifications which follow counselled lineups. Majority opinion in *Ash* at —— of 149 U.S.App. D.C., at 104 of 461 F.2d 92; majority opinion in *Brown* at —— of 149 U.S.App. D.C., at 141 of 461 F.2d 134. Whatever the force of that reasoning, it clearly does not differentiate *Brown* from *Ash*. In *Ash*, just as in *Brown*, the identification interview was conducted by a prosecuting attorney. And as to the reasoning itself, see, for example, the confessions of a liberal and extremely well-intentioned "prosecuting attorney" in Schrag, On Her Majesty's Secret Service: Protecting the Consumer in New York City, 80 Yale L.J. 1529, 1597–1598 (1971):

All of us in the [Consumer] Law Enforcement Division were civil libertarians. We applauded the Supreme Court decision requiring policemen to warn suspects that their admissions could be used against them, and scoffed at police officials who claimed that the case would "hamstring" law enforcement officials. We condemned eavesdropping and wiretapping. We decried the loss of privacy in American life. We demonstrated when police forces took the law into their own hands and beat kids over the head, or when they stood by passively while construction workers did so. We protested the use of informers and secret agents to convict Jimmy Hoffa.

Yet here we were, after experiencing for only one year the frustrations of law enforcement, eager to emulate every police trick we despised, and indeed, ready to invent a few of our own. By the end of that year we had an impressive inventory of electronic gadgetry, including a subminiature tape recorder with one microphone that looked like a vest-pocket fountain pen and another that hooked onto a bra-strap. We thought of the press as one of a number of arrows for our bow, rather than the safeguard of a free people against oppressive government. We first learned that the government had to lie when we discovered that many subpoenas could not be served unless we used a ruse to get into the presence of a company's officers. By the end of the year, we were routinely engaging in deception to fight deception, and even the use of wired secret agents to infiltrate companies was becoming commonplace.

In fact, of the two cases, *Brown* seems to present the greater danger of prejudice to the defense—and hence the greater need for the protection of counsel's presence. For it is precisely where

---

3. Majority opinion in *Ash* at —— of 149 U.S.App.D.C., at 104 of 461 F.2d 92.

a photographic identification follows a corporeal lineup, as in *Brown*, that the need for counsel is likely to be most acute. Photographic identifications are, after all, unlikely to follow lineups at which the witnesses successfully identify the suspect. As *Brown* unfortunately demonstrates, it is only where the prosecution is dissatisfied with the results of the lineup that it has a significant interest in making a second effort to obtain a positive identification. And this second attempt imposes the greatest incentive to resort, wittingly or unwittingly, to suggestive practices. Yet there is no discernible reason to conclude that the prior lineup will in any way enhance the fairness of the second, uncounselled attempt to obtain an identification. And it is entirely unclear to me why the presence of counsel at the earlier lineup —which, by hypothesis, failed to yield a positive identification—is thought to immunize the defendant from prejudice at the *second* identification, where the prosecution is trying to salvage its case and the risks of suggestivity are therefore maximized.

Accordingly, I dissent from *Brown* because it violates the controlling constitutional standard as announced in *Ash*. And for the same reason I would hold in *Ash* that counsel must be present at all photographic identifications held after the accused is in custody whether or not a lineup has previously been held.[4] Nothing less will satisfy the demands of the Sixth Amendment. And nothing more is needed to satisfy the demands of law enforcement.

J. SKELLY WRIGHT, Circuit Judge, with whom BAZELON, Chief Judge, and SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concur, dissenting:

In June 1967 the Supreme Court decided a trilogy of "lineup" cases which brought into sharp focus the problem of pretrial identifications. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L. Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). These cases held that a lineup is a critical stage in the criminal process at which an accused is constitutionally entitled to the assistance of counsel. In reaching this result, the Court noted that pretrial identification procedures are "peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial," and that "[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." 388 U.S. at 228, 87 S.Ct. at 1933.

The Court therefore concluded that the presence of counsel at lineups is necessary (1) to minimize the likelihood of an unduly suggestive confrontation and (2) to enable an informed challenge to be made at trial to either the admissibility or the credibility of identification evidence. *See* Clemons v. United States, 133 U.S.App.D.C. 27, 31, 408 F.2d 1230,

---

4. It is further regrettable that *Ash* may be thought to leave room not only for *Brown* but also for a considerable extension of *Brown*'s unfortunate result. In *Brown* the prosecution displayed to the witness a photograph of the very lineup which the witness had attended. Yet in *Ash* the Court puts to one side all cases in which a lineup was previously held, no matter what sort of photograph is subsequently shown to the witness. Thus, *Ash* refuses to decide whether counsel is constitutionally required where the witness sees a photograph which is *not* of the prior lineup. My objections to *Brown* apply with the same or greater force to this penumbra of *Brown*. Clearly, *Brown* does not control this question since its ill-conceived holding, which is premised in part on the assumed fairness of displaying a photograph of a previous, counselled lineup, has no application to a case where the witness is shown a photograph that is not of a lineup. I can see no justification for expanding the anomalous exception created by *Brown*, or for launching a further assault on the integrity of the principles established in *Ash*.

1234 (1968) (*en banc*), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). With these considerations in mind, the Court laid down a prophylactic rule that evidence of identification at a tainted pretrial lineup is *per se* inadmissible, and the admission of such evidence is cause for automatic reversal unless shown to be "harmless beyond a reasonable doubt." 388 U.S. at 274, 87 S.Ct. 1951.

Recognizing that many of the same dangers inherent in lineup procedures exist also in pretrial photographic identifications,[1] this court in United States v. Ash, 149 U.S.App.D.C. —, 461 F.2d 92 (No. 22,340, decided today) (*en banc*), a companion to this case, held the teachings of *Wade* and *Gilbert* applicable to pretrial photographic identifications. The majority here, however, holds that presence of counsel is unnecessary where the identification is based on a fair and accurate photograph of a properly conducted lineup. I cannot agree. Although such a procedure may avoid many of the hazards inherent in other forms of photographic identifications, the potential for prejudice is by no means eliminated. There are two very separate aspects to the problem of suggestion in this context—the fairness of the photographs themselves and the manner in which they are presented to the witness. It may well be, as the majority suggests, that presence of counsel at the lineup will insure the fairness of the photographs. But the fairness of the photographs themselves is wholly irrelevant to the potential for prejudice in the manner in which they are displayed to the witness. Comment, Criminal Procedure—Photo-Identifications, 43 N.Y. U.L.Rev. 1019, 1025 (1968). Gestures

or comments of the prosecutor at the time of the identification may lead the witness, uncertain at the prior lineup, to select the "correct" defendant. Indeed, the possibilities for suggestion, both conscious and unconscious, are manifold, and the mere fact that the photographs are not themselves prejudicial affords little protection indeed to the unrepresented accused.

The majority argues, however, that photographic identifications conducted by the prosecutor should be judicially acceptable because any dangers that may inhere in such identifications are reasonably guarded against by the professional responsibilities of an attorney. Assuming prosecutorial good faith, however, it can hardly be doubted that a prosecutor is, after all, only human. As such, his behavior may be fraught with wholly *unintentional* nuances which may suggest the "proper" response.[2] Indeed, the Supreme Court in *Wade* made quite clear that it was concerned not only with intentional misbehavior, but also with the possibility of more subtle, yet equally prejudicial, unintentional suggestive influences. 388 U.S. at 229, 235, 236, 87 S.Ct. 1926, 18 L.Ed.2d 1149. These dangers cannot simply be assumed out of existence. Moreover, instances of abuse of prosecutorial discretion are not exactly unknown to the law, and a blanket assumption of prosecutorial good faith is, to say the least, highly questionable.[3]

In a further attempt to justify its result, the majority asserts that the dangers of suggestion and manipulation inherent in this photographic identification session are no greater than the dangers that inhere in any pretrial witness interview. As this court noted in *Ash*, however, there is a crucial distinction

---

1. *See* United States v. Zeiler, 3 Cir., 427 F.2d 1305 (1970); P. M. Wall, Eye-Witness Identification in Criminal Cases 66–89 (1965); Comment, Criminal Procedure—Photo-Identifications, 43 N.Y.U. L.Rev. 1019 (1968); Note, Right to Counsel at Pre-trial Lineup, 63 Nw.U.L. Rev. 251, 258 (1968).

2. *See* Williams & Hammelmann, Identification Parades, Part I, [1963] Crim.L.

Rev. 479, 483; P. M. Wall, *supra* Note 1, at 26–65; Napley, Problems of Effecting the Presentation of the Case for a Defendant, 66 Colum.L.Rev. 94, 98–99 (1966).

3. It should be noted that in *Ash* the court reversed the conviction because of the absence of defense counsel, even though the identification interview was conducted by the prosecutor.

between these two situations. Although the Government is forbidden to introduce testimony on direct of the statements made by a witness at an earlier interview with the prosecutor, no such rule bars admission of the witness' pretrial photographic identification. United States v. Kirby, 138 U.S.App.D.C. 340, 342 n. 2, 427 F.2d 610, 612 n. 2 (1970). Moreover, testimony of a witness' pretrial identification is likely to have far more weight with the jury than the taken for granted in-court identification. Clemons v. United States, *supra*, 133 U.S.App.D.C. at 40, 408 F.2d at 1243. And, as with lineups, once a witness has picked out the accused at a photographic display, he is unlikely to retract that identification later. As a result, " 'the issue of identity may * * * for all practical purposes be determined [at the pretrial confrontation], before the trial.' " United States v. Wade, *supra*, 388 U.S. at 229, 87 S.Ct. at 1933, quoting from Williams & Hammelmann, Identification Parades, Part I, [1963] Crim.L.Rev. 479, 482. Thus the potential prejudice to the accused is far greater in the context of photographic identifications than in the ordinary pretrial interview.

Finally, the majority argues that *Wade* is inapplicable here because "all three persons present [at the identification session] were subjected to vigorous cross-examination, and no hint of suggestivity or unfairness in the presentation on the part of the prosecution was elicited." This argument is, however, a master stroke of circularity; it completely misses the thrust of *Wade*. In

*Wade* the Court made clear that a prophylactic rule of exclusion was required *because* cross-examination alone could not protect the rights of the accused who was unrepresented at the identification. Noting that an absent defense counsel is seldom able to reconstruct at trial the precise manner and mode of lineup identification, the Court concluded that where "the accused is helpless to subject [the pretrial identification] to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him. Pointer v. Texas, 380 U.S. 400 (1965), 85 S.Ct. 1065, 13 L.Ed.2d 923. And even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability. Thus * * * the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the [identification] itself." 388 U.S. at 235, 87 S.Ct. at 1936.

Moreover, the difficulty in reconstructing at trial an uncounselled pretrial photographic identification is substantially greater than an uncounselled lineup, for at least the accused is present at the lineup and can relate what occurred there to his attorney.[4] *See* United States v. Zeiler, 3 Cir., 427 F.2d 1305, 1307 (1970); United States v. Hamilton, 137 U.S.App.D.C. 89, 92, 420 F.2d 1292, 1295 (1969); Thompson v. Nevada, 85 Nev. 134, 451 P.2d 704, 706, cert. denied, 396 U.S. 893, 90 S.Ct. 189, 24 L.Ed.2d 170 (1969); Comment,

---

4. Because the defendant is not present at the photographic identification, irregularities in the procedure may never come to light. The Government, in *Wade*, expressed the problem clearly:

" * * * When the defendant is present—as he is during a lineup—he may personally observe the circumstances, report them to his attorney, and (if he chooses to take the stand) testify about them at trial. When the prosecutor interviews a witness in the absence of an accused, on the other hand,

there is no one present to verify the fairness of the interview or to report any irregularities. If the prosecution were tempted to engage in 'sloppy or biased or fraudulent' conduct, * * * it would be far more likely to do so when the accused is absent than when he himself is being 'used.' "
Brief for petitioner, at 24–25, United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). (Footnotes omitted.)

Criminal Procedure—Photo-Identifications, *supra*, 43 N.Y.U.L.Rev. at 1028. And since "witnesses * * * are [not] likely to be schooled in the detection of suggestive influences," 388 U.S. at 230, 87 S.Ct. at 1934, and consequently cannot be relied on to expose them at trial, the need for presence of counsel is even more compelling in the context of photographic displays. What this court said in Mason v. United States, 134 U.S. App.D.C. 280, 284, 414 F.2d 1176, 1180 (1969), in a slightly different context, is equally pertinent to our own fact situation:

> " * * * An absence of secrecy * * * is at best a modest benefit if no one is watching. So long as only the policeman and the witness know that an identification * * * is in process, the defendant will be hard put to discover the myriad subtle suggestions which may have passed from policeman to witness. * * * "

Thus while it is true, as the majority argues, that defense counsel here was unable to uncover any hint of impropriety in the identification session, we do not know whether this was due to the actual lack of any such impropriety or, rather, to the severe handicap under which defense counsel was required to conduct the cross-examination. *Wade* was intended to eliminate just such uncertainty.

Moreover, the facts of this case demonstrate the need for presence of counsel at photographic displays. Mrs. Edgecomb's identification of the accused came about under what can only be termed "unusual" circumstances. Between June 27, 1969, the date of the robbery, and October 25 of that year, Mrs. Edgecomb selected photographs of several persons other than the defendants as "resembling" the robbers, and on October 25 she failed to identify pictures of both Brown and Proctor. On the following day she again failed to identify a photograph of Proctor, and at the November 4 lineup she was unable to identify any of the defendants. Finally, almost eleven months after the robbery,

and shortly before trial, she identified the accused from a photograph of the lineup in the prosecutor's office.

Under the circumstances, the pretrial photographic identification here in question carried a grave potential for prejudice, whether intentional or not, which may not be capable of reconstruction at trial. And since presence of counsel might well have averted the possibility of such prejudice and would have assured a meaningful confrontation and cross-examination at trial, this case presents the precise type of problem that *Wade* sought to avoid. I would hold, therefore, that pretrial photographic identifications—even where the photograph involved is of the lineup itself—are, like lineups, a critical stage of the prosecution at which the accused is constitutionally entitled to the assistance of counsel. This being so, the ruling of the District Court excluding Mrs. Edgecomb's pretrial identification should be affirmed.

I would also affirm the District Court's ruling as to Mrs. Edgecomb's in-court identification of the accused. In *Wade* the Court held that an in-court identification by a witness who participated in a "tainted" lineup must be excluded unless the Government proves "by clear and convincing evidence that the in-court [identification is] based upon observations of the suspect other than the lineup identification." 388 U.S. at 240, 87 S.Ct. at 1939. Among the factors to be considered in making this determination are the opportunity of the witness to observe during the crime itself, any identification of another person prior to the tainted identification, any failure to identify the accused on a prior occasion, and the lapse of time between the crime and the in-court identification. 388 U.S. at 241, 87 S.Ct. 1926. Here, Mrs. Edgecomb observed the robbers, whom she had never seen before, for only a few moments on June 27, 1969, almost a year before trial. She subsequently failed to identify the defendants or their photographs on no less than four separate occasions. Her inability

to identify the accused, whether or not due to a desire to be fair, evinces an uncertainty that cannot be lightly ignored.

Moreover, the District Court excluded her in-court identification as "tainted in some way by the recent viewing of the photograph." Implicit in this ruling is a finding that the Government had failed to sustain its heavy burden of showing by "clear and convincing evidence" that the in-court identification was based solely on her recollection of the robbers themselves and was not affected by her subsequent exposure to the defendants and their photographs. In light of the "key role" played by the trial court in determining whether there was an independent source for the identification, Clemons v. United States, *supra*, 133 U.S.App.D.C. at 38, 408 F.2d at 1241, I see no reason to disturb the District Court's ruling.

I respectfully dissent.