**UNITED STATES of America**
**v.**
**Howard T. POOLE, Appellant.**
**No. 72–1533.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 14, 1973.

Decided Jan. 17, 1974.

---

Ross O'Donoghue, Washington, D. C. (appointed by this Court) for appellant.

Julius A. Johnson, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, Asst. U. S. Atty., were on the brief for appellee.

Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

This is an appeal from a conviction for armed rape, armed robbery and assault with a deadly weapon. The offense took place on February 17, 1971, when a secretary to a United States Senator was accosted in the parking lot of the Senate Office Building shortly after lunch. It is contended that appellant's confession to the police should not have been admitted in evidence, that it was improperly obtained and was involuntary. We do not agree, and we affirm.

## I. FACTS AND BACKGROUND

### The Offense

The complainant testified that she was about to get into her car when appellant grabbed the door on the driver's side, pointed a pistol at the secretary's head and threatened to "blow [her] head off" unless she kept quiet and moved over, which she did. He then got into the car and, still waving his pistol, drove his victim into an alley, where he ordered her to open her purse and hand him her money.

Not satisfied, and afraid he was being watched, appellant drove to an abandoned garage, ordered his victim to take off her clothes and raped her. When he was done, appellant removed a scarf from the secretary's purse and wiped portions of the automobile that he thought he had touched, for the obvious purpose of removing fingerprints.[1] He then secured a charge plate with his victim's name and address and warned her that if she told anyone of his crimes, "my boys are going to come out and kill your children." With that he left.

About a week later, complainant assisted a police artist in the preparation of a composite sketch of her assailant. This was reproduced and distributed to all police in the area.

---

1. One clear print was later found but not identified. Tr. IV–111.

## The Arrest

About three weeks after the rape, on March 2, 1971, Police Officers Szewczyk and Wyatt, in casual clothes, were patrolling in their squad car near the intersection of 3rd and A Streets, N.E., a place in the Capitol Hill area only a few blocks from the Senate Office Building. At about 8:15 p. m., they observed a man on foot (appellant), who, they thought, resembled the police sketch of the rapist. They noted that he did not travel the path of a person going from one place to another, but rather engaged in changes of direction and crossing streets at other than designated corner paths. At one point the man was seemingly taking a path so as to maintain covert observation of a church door nearby. When a woman was seen to leave the church, appellant started in her direction, but changed direction when it developed that she was joined by a man who left the church shortly after she did.

At this point, Officer Szewczyk decided to confront appellant directly, got out of his patrol car and, holding his badge in his hand, identified himself. He told appellant he wanted to talk with him, to which appellant replied, shouting, "what have I done, what have I done." When Officer Szewczyk asked him to take his hand out of his pocket, he fled. The police pursued, and when appellant stopped, turned, and pulled out a pistol, Officer Szewczyk removed his service revolver from his holster and pointed it at appellant and ordered him to halt. Appellant discarded an object, later identified as a .38 calibre pistol, containing five live rounds, and continued flight. When he was overtaken and searched, the police found several .38 calibre cartridges in his coat pocket. Appellant was immediately arrested, handcuffed and advised of his rights to counsel and to remain silent.

## The Questioning

Appellant, an eighteen-year-old youth, was transported to the First District Headquarters, where he was charged with carrying a dangerous weapon. There he was held until about 11:45 p. m. He was questioned about various crimes—he admitted generally to robberies to support his $60 a day narcotics habit, but did not supply supporting details.

Appellant was advised of his rights at least four times on March 2. Immediately after his arrest, he was read Police Department Form 47.[2] Subsequently, at 9 p. m., 10:35 p. m., and 11 p. m., appellant was again given the *Miranda* warnings, as questioning moved from one subject to another, and the officers familiar with the new subject matter were called in. On each of these latter three ocassions, appellant signed a statement stating that he had heard and understood the warnings and consented to being questioned without the presence of counsel.

---

2. Following Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Metropolitan Police Department developed Form 47, which reads as follows:

WARNING

You are under arrest. Before we ask you any questions, you must understand what your rights are.

You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions. Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning.

If you cannot afford a lawyer and want one, a lawyer will be provided for you.

If you want to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

WAIVER

1. Have you read or had read to you the warning as to your rights? . . . . . . . . . . . . . .
2. Do you understand these rights? . . . . . .
3. Do you wish to answer any questions? . . . . . . . . . . . . . .
4. Do you wish to have an attorney present during questioning? . . . . . . . . . . . . . .
5. Signature of defendant on line below. . . . . . . . . . . . . . . . . . . . . . . . .
6. Time . . . . . . . . . . . Date . . . . . . . . . .
7. Signature of officer . . . . . . . . . . . . . . . . . .
8. Signature of witness . . . . . . . . . . . . . . . .

Shortly after 10 p. m., officers of the Sex Squad, who had been called in view of appellant's resemblance to the composite sketch, arrived at the police station (Tr. IV–97). After the arresting officers were through, Officer Kelly of the Sex Squad and his partner went to another room where they took a photograph of appellant and pubic hair samples (Tr. IV–97–98).

Mr. Kelly testified that he then offered Poole a cigarette, and started to talk to appellant, after establishing that appellant had been advised of his rights (Tr. IV–100). Officer Kelly confronted appellant with the fact "that he was a very good look-alike as far as the composite and if the complainant could make a composite that well of a suspect by a drawing, that if she saw a photograph of the suspect, she most likely could identify him." (Tr. IV–98). Officer Kelly also told Poole of the possibility that there could be identification through fingerprints and analysis of the pubic hair. "At that time I asked Mr. Poole if he committed the rape and he told me 'no.' Then he hesitated a little bit and he asked Detective Tague, my partner, to leave the room." (Tr. IV–98). When they were alone, Officer Kelly offered Poole another cigarette, and Poole asked about the possibility of a high bond. Mr. Kelly told appellant that if he wanted to confess they could go to the Sex Squad, but there would be no promises. Appellant then looked around a little bit, and said, "Okay, let's go to the Sex Squad." On questioning, he said he had raped the secretary, and he gave details that included items which had never appeared in the press. At that point, Officer Kelly stopped appellant, they went to the Sex Squad, arriving about 11 p. m., and there appellant, advised again of his rights, agreed to make a written statement to an officer sitting at the typewriter. A pre-trial motion to suppress this written statement was unsuccessful. At trial, the confession was offered in evidence and admitted over objection.

*The Identification*

When appellant appeared in a lineup, with counsel present, on March 16, 1971, the complaining witness, admitting nervousness, did not identify him, identifying tentatively someone else. A few weeks later, after testifying before the grand jury, she asked Sergeant Waybright to show her a photograph of the lineup. On viewing this photograph, without any suggestion, she identified appellant as her assailant. This photographic identification, as well as an in-court identification at trial, were allowed in evidence over objection.

## II. IDENTIFICATION ISSUES

■ We may note at the outset that there are no significant legal issues in regard to the identification or the identification procedures. Appellant's legal challenges are obviated by United States v. Ash, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), which determined that there is no right to counsel when photographs are displayed to a complainant for the purpose of identification of a suspect. In United States v. Brown, 149 U.S.App.D.C. 43, 461 F.2d 134 (1972) (en banc), we upheld the showing of a photograph of a counselled lineup in circumstances not significantly different.

## III. ADMISSIBILITY OF CONFESSION

### A. *Appellant's Waivers After Being Advised of His Rights*

■ In our view, the defendant, after receiving valid *Miranda* warnings, knowingly and voluntarily waived his rights to remain silent and to counsel. Appellant was given the warnings on the street by Officer Szewczyk when arrested at 8:35 p. m. He was read the warnings at the stationhouse at about 9 p. m. by Officer Quantrelle (Tr. II–83), who

asked Poole to sign the form.[3] During this conversation, Mr. Quantrelle learned of appellant's heroin addiction, but appellant gave no indication—verbal or otherwise—that he was undergoing withdrawal (Tr. II 85–86). He did not complain about his physical condition; he did not appear to be in pain; his eyes did not appear to be running (Tr. II–73). Also during this conversation, appellant admitted to having committed certain robberies, although he denied complicity in others. (Tr. II–87).

Although appellant denies being warned on the street, he admits that his rights were read to him at the stationhouse shortly after his arrival. He further expressly testified that he understood what they were saying, that he did not ask to call a lawyer, and did not tell the police he would not talk to them. (Tr. A 34–35). And the record reveals at least two other occasions upon which appellant was advised of his rights prior to confession. Although the testimony of the police was in certain respects at variance with that of appellant, compare e. g., Tr. II 95 with Tr. A 20, appellant's own testimony on this matter is somewhat inconsistent.[4] The issue is one of credibility.

We conclude that appellant had the capacity to waive his rights. He claims that he was young, ignorant and easily cowed, and that as a heroin addict undergoing withdrawal he was without power to resist the blandishments of his interrogators. These assertions are not supported by the record.

The record supports the findings of the trial judge that the record establishes by "more than a preponderance of the evidence No. 1, that he was not in withdrawal at the time and, No. 2, that his confession was in fact freely given without coercion of any kind." (Tr. II 136).

To be sure, appellant was a youth of 18 years when arrested, and had dropped out of school in the 10th grade. Though he was young chronologically, he was not unacquainted with criminal procedures. The record shows that he had previously been arrested as many as twenty times, that included among the prior charges was armed robbery, to which he subsequently pleaded guilty. (Tr. A–37), (Sentencing Tr. 8). He had been advised of his rights each time he was arrested. He understood his rights when they were read upon arrival at the stationhouse (Tr. A 34), and indicated impatience when they were read to him again.[5] (Tr. II 95).

At trial, appellant's attack on the voluntariness of his confession was based on his testimony that he was undergoing heroin withdrawal when he made the statement. This testimony is contradicted by all other witnesses; in fact, appellant's testimony as to the sudden onset and immediate severity of his symptoms (Tr. A 30), does not lend much credence to his story. The trial court believed the police on this point, and we see no warrant to reverse.

Somewhat inconsistently, it is now speculated that if appellant was not undergoing withdrawal, he may well have been in a state of drug-induced lethargy. This kind of double barrelled approach could vitiate most if not all statements by narcotic addicts, even if counseled. It suffices in the present case to say that the record simply does not support speculation about the incapacity of appellant. The testimony credited by the trial judge depicted a suspect who was aware,

---

3. The fact that appellant printed his name at that time, Officer Quantrelle testified, was not unusual. (Tr. II 85). The other times, appellant signed his name and the waivers.

4. See, e. g., Tr. A 33–35.

5. With appellant fully aware of his rights to counsel and to keep silent, the police were not bound to make a special effort to inform him that his rights persisted when the subject shifted from robbery to rape, though this procedure is ordinarily preferable as assuring that any officer receiving a statement will be able to testify as to the warnings given. Officer Kelly of the Sex Squad testified that when he came on to the scene he elicited from appellant that he had already been informed of those rights.

even impatient, rather than either stupefied or tormented.[6]

We follow the approach set forth in United States v. Frazier, 155 U.S.App. D.C. 135, 476 F.2d 891 (1973) (en banc), in which we held that where the police follow the *Miranda* procedure carefully, appellate courts should be slow to mandate additional responsibilities. In the instant case, all indications point to an informed and voluntary waiver of the rights to counsel and to remain silent.

### B. *Claim of Unlawful Detention Under Rule 5(a)*

Appellant also contends that the confession should have been suppressed in that it was obtained while appellant was unduly detained in the stationhouse before presentment to a magistrate in violation of Rule 5(a) of the Federal Rules of Criminal Procedure. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). A like contention was fully discussed and rejected in Pettyjohn v. United States, 136 U.S.App. D.C. 69, 419 F.2d 651 (1969), cert. denied, 397 U.S. 1058, 90 S.Ct. 1383, 25 L. Ed.2d 676 (1970) and Frazier v. United States, 136 U.S.App.D.C. 180, 419 F.2d 1161 (1969).

■ Those holdings were based on the understanding that the primary purpose of the *Mallory* rule is to ensure that suspects are advised of their rights to silence and counsel, to prevent the coercion inherent in prolonged custodial isolation. When there is intelligent waiver of the rights to counsel and to remain silent, and the accused voluntarily submits to interrogation, this aim of the *Mallory* rule is accomplished. While as a matter of formal logic it might be argued that the law requires immediate presentation to a magistrate, under Rule 5(a), of a person who voluntarily talks

to the police on a waiver of his right to keep silent and have counsel, *Pettyjohn* and *Frazier* establish that the substantial purpose of protection of basic rights does not interpose this separate requirement, for even though the advices are given by a police officer rather than a court, they are nonetheless significant. As the Court stated in *Miranda supra*, 384 U.S. at 469, 86 S.Ct. at 1625:

> This warning is needed in order to make [defendant] aware not only of the privilege, but also of the consequences of foregoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.

■ The extent and nature of a suspect's detention may of course be taken into account, as part of the totality of pertinent circumstances, in determining whether a confession was inadmissible for lack of voluntariness. This aspect of the case is discussed in section III, C. What we say at this juncture is that appellant is not entitled, in view of his waivers, to an automatic interdiction of a voluntary confession on the basis of *Mallory* and Rule 5(a).

### C. *Claim that Confession Was Involuntary Under Totality of Circumstances*

Our dissenting colleague concludes that the totality of circumstances require an appellate determination of lack of voluntariness in the confession. We therefore review the circumstances whose totality are said to result in a

---

6. The trial court found (Tr. II–135) :
   On the contrary, all the evidence that I have heard, except Mr. Poole's, by the various officers, it was unanimously testified to by the officers that there were no signs of physical discomfort. They were not aware that he was in any pain or discomfort of any kind ; that he was cooperative with them ; that he was able to sort out one robbery from another, thus indicating that he was thinking, that he was alert ; that at all times he was alert to what was going on. When he talked to his mother, he was showing remorse for the crime he admitted he had committed

conclusion that Poole was subject to compulsion.

■■ 1. The questioning in the absence of counsel does put a heavy burden on the Government to show a waiver of rights, but this case shows a waiving of rights, and waiver repeated to the point of Poole's impatience.

2. It is said that appellant was a youth of 18, who says he was frightened when arrested. A large and growing percentage of arrested offenders are youths. They are probably uneasy when arrested. Their youth is presumably taken into account, along with the nature of the offense involved and prior record, in determining whether they should be let off by the police without an arrest. The judge takes it into account in determining whether they should be given probation instead of other sentence, or should be sentenced under the Youth Corrections Act. But youth alone does not immunize the young from an appraisal of the extent of current criminality. This means asking questions, and if a lawyer is knowingly waived the youth may be questioned although no lawyer is present.

3. The assertion that Poole was frightened when arrested, given fillip by noting that he was arrested at gunpoint, requires that we emphasize the circumstances of the arrest; appellant's resemblance to the sketch and his suspicious street conduct led police to identify themselves and ask to talk; it was only after appellant shouted, took flight, drew his pistol and turned toward the police, that he was arrested.

4. We fail to see on what basis it can fairly be said that pressures constituting a "compulsion to confess" were presented by the action of the police in "confronting him [Poole] with the composite, telling him the victim most likely would identify him, the physical taking of his pubic hairs, representing to him that the hairs they had could possibly match those found on the property of the complainant, and stating that they possibly had some fingerprints."

A confession is not involuntary because a Sex Squad officer shows a composite sketch, developed with the help of a complainant, and says that the suspect is a very good look-alike, and if a complainant could make that good a composite by a drawing, if she was shown a photograph "she most likely could identify him." (Tr. IV–98). The pressure of incriminating evidence is not what the law means when it refers to compulsion that undermines voluntariness, except perhaps in highly unusual pathological situations.

Nor was there "compulsion" invalidating the confession because the Sex Squad officer told appellant of the tests normally performed in sex cases, of the taking of fingerprints and hairs. This was not, like the sketch, a statement of evidence already incriminating, but a statement of the possibility that other evidence incriminating the suspect may be developed. (Tr. IV–111). There was a "print positive" for the rape offense, though of a person still unknown. (*Id.*)

As to the taking of pubic hair, that may, like the taking of prints, have been a search and seizure,[7] and it may have been taken into account by the defendant as opening the door to the possibility that the police might establish evidence incriminating him, but it was not a compulsion that drained his statement of voluntariness. The analysis is not advanced by noting that it was an invasion of personality. So was the fingerprint and photograph. So was the drawing of a blood sample that was held in Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908

7. We are not required to consider in what circumstances such a search and seizure may be had. The question under discussion is whether the confession was involuntary and its use a denial of due process. This case has not been presented or focused as a claim that somehow the confession is the fruit of a poisoned search, and we do not think it appropriate at this juncture, to determine whether the police had reasonable cause to arrest defendant for rape (as well as possession of a deadly weapon) or what are the incidents of a reasonable search incident to such an arrest.

(1966), not to involve the privilege against self-incrimination and to be consistent with both due process and the protection of privacy embodied in the Fourth Amendment. The taking and matching of a suspect's hairs may be a reasonable step in government investigation.[8] The fact that these are pubic hairs stems from the nature of the offense.[9]

5. The facts of this case are a far cry from the kind of overbearing that might arguably constitute psychological compulsion. There were no threats or promises. This is not even a case where the policeman voiced sympathetic understanding of defendant's predicament. While the officer may have exaggerated the possibility that additional evidence might be found, the reality of the composite sketch can hardly be faulted. Even the more stringent case of use by police of informant agents or other ruses [10] does not automatically undermine the voluntariness of the statements elicited.

6. The fact that Poole was a narcotic addict does not negative voluntariness. The credited testimony of the police officer is that appellant did not complain of withdrawal pains until the next day, did not seem to be in pain or exhibit e. g., a running of the eyes and that he was alert, aware of his rights and impatient. Appellant's own testimony is undercut by his admission that when he was running from the police, a half-hour before arriving at the stationhouse, he was not experiencing any withdrawal pains (Tr. A–30).

7. The "totality of circumstances" may be shorthand to denote that the whole is greater than the sum of its parts. That is often true, but here there are parts of the evidence which would have to be glossed over in order to find compulsion overriding will: the circumstances of the arrest (and appellant's past experience in being arrested) diluting the inference of apprehension from an arrest at gunpoint; the repeated advice as to rights to counsel and not to speak and the substantiated finding of waiver; the use by the Sex Squad of the composite sketch as reflecting not impermissible pressure but straightforward presentation of incriminating evidence; and so on.

Perhaps a seasoned advocate would tell a suspect-client, Don't say anything, no matter what they show you or say. But *Miranda* does provide for waiver of counsel. The lack of counsel does not become compulsion as a matter of law because the suspect is a young narcotic addict (at least in the absence of withdrawal agony), who is advised of substantial evidence that is incriminating, and of the possibility that other evidence may link him to the crime.

The ultimate determination of voluntariness and waiver, vel non, is for this court to make, although we are rightly guided by the trial judge insofar as this must depend on matters, like demeanor, that cannot be captured in a cold record. On our own review of the record we are of the opinion that the Government has met its burden of adducing the pertinent facts as to what happened, and of showing that the defendant's confession was voluntary and not coerced and that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Under the jurisprudence of this court, the conviction for assault with a deadly weapon must be vacated,[11] but otherwise the judgment is affirmed.

So ordered.

---

8. United States v. Allen, 337 F.Supp. 1041, 1043 (E.D.Pa.1972) ; *cf.* Wise v. Murphy, 275 A.2d 205, 214–215 (D.C.C.A.1971).

9. *Cf.*, United States v. Sheard, 154 U.S.App. D.C. 9, 473 F.2d 139 (1972), cert. denied, 412 U.S. 943, 93 S.Ct. 2784, 37 L.Ed.2d 404 (1973) (benzidine test on penis).

10. United States v. Lemonakis & Enten, 158 U.S.App.D.C. 162, 485 F.2d 941 (1973) ; United States v. Kinnard & Payne, 150 U.S. App.D.C. 386, 465 F.2d 566 (1972).

11. *See* United States v. Benn, 155 U.S.App. D.C. 180, 476 F.2d 1127 (1973) ; United States v. Johnson, 155 U.S.App.D.C. 28, 475 F.2d 1297 (1973).

LEVENTHAL, Circuit Judge (concurring):

Occasionally I add a concurring opinion of my own to a majority opinion written for the court,[1] when I have a thought that is appropriate for presentation as an individual reflection and that need not be cast as authoritative pronouncement. Indeed, that is one of the prime virtues of the concurring opinion.

The fact that we place our ruling on a waiver by appellant is not to be taken as a concession or ruling that his confession would have been inadmissible under *Mallory*. The particular facts of appellant's case involve an arrest at night, which meant that there was no judicial presentment under Rule 5(a) until the next day.[2] There are decisions indicating that mere delay for this reason is not "unnecessary delay within Rule 5(a)."[3] The court is not called upon to consider or apply that doctrine, or to determine the question whether the confession would have been inadmissible under *Mallory* in the absence of waiver. However, I think it appropriate to note that the current status of the *Mallory* rule does not preclude our determination of the effectiveness of appellant's waiver.

Prior to the 1966 *Miranda* decision, the Federal courts had in a series of rulings given full vitality to Rule 5(a), which requires presentment without unnecessary delay to a judicial officer, who advises the suspect of his right to remain silent and to be represented by counsel, and held this operated to prohibit any detention for the purpose of conducting interrogations and that the product of any such detention must be excluded from evidence. The rulings extend from the Supreme Court's 1957 decision in *Mallory* to this court's decision in Spriggs v. United States, 118 U.S. App.D.C. 248, 335 F.2d 283 (1964). The *Spriggs* opinion, by Judge Fahy, acknowledged that it "may well be" that forms must be filled out prior to the prisoner's appearance before a magistrate[4] yet held that a confession during the form-filling period was inadmissible, since *Mallory* is not intended merely to procure compliance with Rule 5(a) but broadly to strike at the unreliability of evidence obtained by secret police interrogation, and to safeguard the constitutional guarantees of right to counsel and public trial and against compelled self-incrimination.[5]

*Spriggs* was not directly concerned with the issue of whether there could be police interrogations after arrest under a doctrine of waiver, for there was no contention that the suspect had been given the advice of the right to counsel which a magistrate would have provided. There are passages in the opinion which strike at the conception that a "secret police interrogation" could be sustained on the basis of the suspect's actions or knowledge, and hence impliedly at least would reject the idea that a waiver doctrine could be meaningful.[6]

1. *See, e. g.*, Bellei v. Rusk, 296 F.Supp. 1247, 1252 (D.D.C.1969) (three-judge court), rev'd, 401 U.S. 815, 91 S.Ct. 1060, 28 L.Ed. 2d 499 (1971).

2. Appellant Poole was arrested at approximately 8:30 p. m., at a time when no magistrate before whom he could have been brought was readily available. It is the practice in the District of Columbia to bring persons arrested in the evening to the courthouse next morning, and later, after counsel is appointed, to conduct the presentment under Rule 5(a) before a judge of the Superior Court or a United States Magistrate.

3. *See* United States v. Marrero, 450 F.2d 373 (2d Cir. 1972), cert. denied, 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972); United States v. Collins, 462 F.2d 792 (2d Cir. 1972); United States v. Mills, 434 F.2d 266, 273 (8th Cir. 1970), cert. denied, 401 U.S. 925, 91 S.Ct. 908, 27 L.Ed.2d 828 (1971); United States v. Vita, 294 F.2d 524, 529 n. 1 (2d Cir. 1961); Lockley v. United States, 106 U.S.App.D.C. 163, 270 F.2d 915 (1959); Washington v. United States, 103 U.S.App. D.C. 396, 258 F.2d 696 (1958).

4. 118 U.S.App.D.C. at 251, 335 F.2d at 286.

5. *Ibid.*

6. The court said that it was of little consequence what the officer said he told the prisoner (that he need make no statement and it could be used against him. "In the varying circumstances affecting different persons, with differences in the experience,

In Greenwell v. United States, 119 U. S.App.D.C. 43, 49, 336 F.2d 962, 968 (1964) the court raised the question whether, absent an opportunity for independent legal advice, there can be a truly voluntary and intelligent waiver of the right to prompt presentment. But it limited its holding to a statement that the "courts look with great suspicion" on evidence that an arrested person, during a period of unnecessary delay, consented voluntarily to cooperate with the police—in short to a presumption of involuntariness.

Then came Miranda v. Arizona in 1966. It was, of course, directed to the vice of secret police interrogation, and to the protection of the Fifth and Sixth Amendment rights. But in announcing a rule of due process for the States which embraced those rights by incorporation, what it prohibited was questioning of persons in custody unless they were apprised of those rights and made a voluntary and effective waiver. The Supreme Court referred to *Mallory*, though based on "supervisory rules [5(a)] . . . excluding evidence obtained in default of [a] statutory obligation" as related to the same considerations of Fifth Amendment policy, and noted that "when Federal officials arrest an individual they must as always comply with the dictates of the congressional legislation." 384 U.S. at 463, 86 S.Ct. at 1622, 16 L.Ed.2d 694.

The reference in *Miranda* to a Federal supervisory rule based on statute, going beyond that required by the Constitution for the States, must be taken in conjunction with 18 U.S.C. § 3501, effective June 19, 1968. The relevant provision of section 3501 in this connection is contained in § 3501(c) that a confession "shall not be inadmissible solely because of delay in bringing [the person arrested and in custody] before a magistrate . . . if such confession is found by the trial judge to have been made volun-

tarily . . . and if such confession was made or given by such person within six hours immediately following his arrest or other detention. . . ."

In view of the *Miranda* warnings and waiver, there is no need in this case even remotely to consider whether the other provisions of § 3501, which purport to make a confession "admissible in evidence if it is voluntary" are operative to rescue a confession that violates the constitutional rights safeguarded by *Miranda*. As to the relationship between 3501(c) and *Mallory* it has been said that the text and legislative history make it "obvious that the prime purpose of Congress in the enactment of § 3501 was to ameliorate the effect of the decision in *Mallory* . . . to remove delay alone as a cause for rejecting admission into evidence of a confession." United States v. Halbert, 436 F.2d 1226, 1231 (9th Cir. 1970). But that would still leave open whether 3501 would require admission in evidence of a confession attacked not merely on ground of delay after arrest but also on the ground that the defendant, without advice as to his rights and waiver, was subject to harassment. United States v. Marrero, 450 F.2d 373, 378 (2d Cir. 1971).

Another limitation on § 3501(c) may apply in the circumstances of Adams v. United States, 130 U.S.App.D.C. 203, 399 F.2d 574, although that opinion, decided June 21, 1968, did not discuss the then recently effective § 3501(a). In that case, a person arrested for a robbery, brought to the Robbery Squad at 2 p. m. and booked at 4 p. m., was then put in lineups for possible detection of other crimes as to which there was no probable cause to arrest or detain him. The court excluded the result of the lineups, as in legal effect, at least as of 4 p. m., the incident of an unlawful arrest and custody for investigation. The heart of that decision was set forth in

education and other individual attributes, it is impossible to measure accurately the pressures in a Police Station upon prisoners

under secret interrogation without counsel, relative or friend." 118 U.S.App.D.C. at 250, 335 F.2d at 285.

Judge McGowan's opinion in these words:[7]

> Here, the lawful basis for appellants' arrest and detention rested solely on the probable cause for the belief that they had committed an attempted robbery on November 5 at the North Carolina Avenue store. There was no probable cause to detain them under arrest for other matters. Rule 5(a) provides that presentment without unnecessary delay shall be made on the charge for which they were arrested. To continue their custody without presentment for the purpose of trying to connect them with other crimes is to hold in custody for investigation only, and that is illegal; its operative effect is essentially the same as a new arrest and, if not supported by probable cause, it is an illegal detention.
>
> \* \* \* \* \* \*
>
> On the precise facts shown by this record, we think the effect of Rule 5(a) is to convert, at least as of 4:00 P.M. on the afternoon of appellants' arrest, their continued detention at the police station into an unlawful arrest without probable cause in respect of the crime for which they were convicted. It is not, thus, the precise scope of the *Mallory* exclusionary rule which is determinative here but, rather, the sweep of the general policy of excluding evidence gathered during a period of detention following upon an unlawful arrest.
>
> \* \* \* \* \* \*
>
> The concept of what is, in legal contemplation, a "divisible detention" is not, in our view, extraordinary. Indeed, it seems to be a necessary one if

the subversion of the purposes of Rule 5(a) is not to be made the handmaiden of the constitutionally defective arrest for investigation.

> The court concluded by noting the importance of the rights secured by Rule 5(a)—judicial advice of a suspect's rights, including provision of counsel; and the opportunity to gain his freedom by persuading the magistrate there is no probable cause to hold him for the crime for which he was arrested.

*Adams* would stand consistent with 3501(c) if that law's provision for admittance of a confession from a person arrested and in custody is assumed to premise a lawful arrest, and to accept the *Adams* ruling that a person is considered to be in detention without lawful arrest if he is held, during an unnecessary delay in presentment to a magistrate, for questioning about a crime on which there was no probable cause to arrest him. Assuming such continued reach of *Adams*, that would not help appellant Poole, for the police officers' awareness of appellant's resemblance to the sketch, his conduct on the street in moving toward the woman at the church and veering when a man appeared, and his possession of a gun, sufficed for probable cause to arrest him for the offense against the Senator's secretary. The pertinent questioning of appellant related to that specific offense.

And of course 3501(c) leaves intact the reach of *Mallory* insofar as that case makes clear that an unnecessary delay after arrest is evidence of involuntariness, though not per se conclusive on that issue.[8]

---

7. 130 U.S.App.D.C. at 206–207, 399 F.2d at 577–578.

8. This seems to be the thrust of United States v. Robinson, 142 U.S.App.D.C. 43, 439 F.2d 553 (1970). The court held, in an opinion authored by Judge Fahy, Judge McGowan dissenting, that the statement given by the inmate of a mental hospital to the police officer investigating a homicide was, under the facts, involuntary. Judge Fahy referred to *Mallory* as a judicial rule of evidence essential to effectuate Rule 5(a), and

added: "Moreover, 18 U.S.C. § 3501(c) does not nullify this judicial rule of evidence, but only restricts its application in circumstances which are not relevant to the case before us." This terse statement apparently refers, if one may judge from the context of the following paragraphs under the same point of the opinion (point III, A), to a ruling that the non-compliance with Rule 5(a)'s safeguard "left operative the compulsion which, without those safeguards, caused the confessions to be involuntary."

I identify the foregoing complexities not to propose dispositive rulings on how the *Mallory* issue should be handled in this case in the absence of waiver, but to underscore adherence to the *Pettyjohn* and *Frazier* rulings concerning waiver of defendant's rights.

There is a final aspect of this case that concerns me: I must confess that I am somewhat troubled not by the particular case but by the general problem of the narcotic addict who may be near withdrawal.[9] I would hope that the appropriate authorities in the police and health departments either have arranged or will be able to arrange a procedure whereby appropriate para-medical or medical personnel would be available "after hours" to provide transitional medication, perhaps methadone, as an interim procedure. Compare United States v. Collins, 462 F.2d 792, 796 (2d Cir. 1972).

FAHY, Senior Circuit Judge (dissenting from affirmance).

I

The objection to the admission in evidence of the confessions of rape should have been sustained in my opinion. The court holds that "the defendant, after receiving valid *Miranda* warnings, knowingly and voluntarily waived his rights to remain silent and to counsel." Assuming the waivers referred to, the confession itself is not for that reason voluntary—it is simply not inadmissible for non-compliance with *Miranda*. Furthermore, the Fifth Amendment privilege against compelled self-incrimination places the responsibility upon the appellate court to determine independently whether undisputed facts show a violation of this constitutional protection.[1] This standard of review is not carried out by the holding with respect to the *Miranda* waiver above noted.

II

On the issue of voluntariness of the confessions it is preliminarily noted that when a confession has resulted from in-custody interrogation by the police, as here, its admissibility is suspect, in contrast with a confession made in open court by plea of guilty, or perhaps in contrast with a confession due to in-custody interrogation but adhered to rather than being subsequently repudiated.[2] This is so because of the importance attached by the Founders to the integrity of human personality represented by the Fifth Amendment privilege, as well as by the inherent coerciveness of such interrogation.[3] The suspect character of such confessions is due also to the difficulty a court has in recapturing long after the events the weight of the pressures exerted upon an accused person by in-custody interrogation by several skilled officers to extract an acknowledgment of guilt while he is under their complete domination, without friend, relative, impartial observer or

---

9. He may need attention whether or not it is proposed to question him. The fact that he is near withdrawal, however, does not undercut an effective waiver, after warnings of his rights, or established that he is immune from questioning.

1. Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Haynes v. Washington, 373 U.S. 503, 515, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Haley v. Ohio, 332 U.S. 596, 601, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); Ashcraft v. Tennessee, 322 U.S. 143, 64 S. Ct. 921, 88 L.Ed. 1192 (1944); Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L. Ed. 166 (1941); Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940).

2. Even in these circumstances it is essential that it be corroborated, evidencing the care of the law not to sentence on the basis of a confession. Smith v. United States, 348 U.S. 147, 152–153, 75 S.Ct. 194, 99 L.Ed. 192 (1954).

3. Among the decisions of the Supreme Court reflecting this are Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); Chambers v. Florida, *supra*, and the more recent review of the whole subject in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

counsel. Such a confession is suspect also because unless excluded from evidence the subsequent public trial with counsel before a judge and jury is not in reality a trial of the defendant's guilt or innocence but is in substance a trial of what occurred in secret at the police interrogation. Yet the Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial, by an impartial jury . . . to be confronted with the witnesses against him . . . and to have the Assistance of Counsel for his defense.

U.S.Const. amend. VI.

The courts must enforce the substance of these provisions and not be satisfied with their shadow. See United States v. Wade, 388 U.S. 218, 224–225 (1967); *Miranda, supra,* 384 U.S. at 448, 457, 86 S.Ct. 1602. When a confession obtained in those circumstances which here are undisputed, by secret interrogation of an eighteen-year-old frightened youth, is admitted at his later trial, these constitutional provisions are neglected by the court.

It is no answer to say he waived his right to counsel after being advised of the right. The fact is he did not have counsel and the issue of voluntariness of the confessions must be decided with that in mind. The Supreme Court recognizes that even with a lawyer present coercion may be exercised. *Miranda, supra,* 384 U.S. at 470, and see 475–476, 86 S.Ct. 1602. It is claimed he was advised that anything he said might be used against him. Even so, it does not follow that what he said was voluntary. It also is claimed he was advised he need not say anything. But, again, the issue of voluntariness remains.[4] A *Miranda* waiver does no more than remove the *Miranda* bar to the admission of a con-fession. It does not solve the issue of its voluntariness. United States v. Bernett, 161 U.S.App.D.C. ——, 495 F.2d 943 (1973) (statement of position of Judge Robinson).

### III

The facts on that issue are outlined as follows: Appellant was an eighteen-year-old drug addict. He was accosted on the street, though not then arrested, by two plainclothed officers because they thought he resembled a suspect who had been described as having committed crimes in the neighborhood. He ran and was pursued at gunpoint. The pursuing officer later testified, "I had my service revolver out and I aimed it at the defendant, again telling him to halt." "He continued running . . . , shouting, 'Don't shoot, don't shoot.'" ". . . I caught up with him and grabbed him by the collar, handcuffed him and advised him of his constitutional rights." ". . . He was visibly shaken. . . . I think the fact that I almost shot him bothered him, and also bothered me." Appellant had discarded a gun as he ran; it was recovered by one of the officers and appellant was arrested for carrying a concealed weapon. This was at 8:30 p. m.

Arrested and being booked for carrying a concealed weapon he was first interrogated about a number of robberies, instead of being taken before a magistrate in accordance with Rule 5(a) F.R. Crim.P. He admitted several robberies and denied others.[5] It is not clear exactly how many officers engaged in interrogating him. But Officer Szewczyk, the arresting officer, said that he was interrogated—"interviewed" as he expressed it—by detectives from the First District, a detective from the Robbery Squad and then by detectives from the Sex Squad, who had been called from another station. He also testified, on

---

4. He was never advised that arresting authorities were under a legal obligation under Rule 5(a), F.R.Crim.P., to take him without unnecessary delay before a magistrate. This omission will be discussed further on in this opinion.

5. At the suppression hearing appellant admitted to committing robberies to support his $60.00 a day heroin habit, but he denied confessing to any specific robbery.

being asked whether he interrogated defendant about any robberies, that he had not, adding, "I didn't have a chance to . . . Everybody else was interrogating him . . . two—two or three." "Is it fair to say," he was asked, "that between 8:30 in the evening . . . and 2:00 a. m. . . . Mr. Poole was being questioned continuously by police officers, whether they be Robbery Squad, Sex Squad or members of the First District?" He answered, "Quite a bit of the time, yes, sir."

The officers had noticed appellant's resemblance to a composite sketch of the person who had raped a secretary two weeks earlier in the general vicinity where appellant was arrested and they advised their superior of this fact, suggesting that the Sex Squad be notified. Following the interrogation about the robberies, the interrogation then turned to the rape. Officer Kelly and Detective Tague of the Sex Squad had arrived for this purpose and took up the interrogation at approximately 10:00 p. m. They took appellant to another room where they photographed him. He was required partially to strip so they could take samples of his pubic hair. The following then occurred according to Officer Kelly's own testimony:

> After we took the pictures and the pubic hairs, I offered Mr. Poole a cigarette. He accepted it and I confronted him with the fact that we had pictures and that the complainant made, through the composite, such a strong resemblance of the man who assaulted her that she could most likely identify him.
>
> I then informed him that the hairs that we had of his could possibly match the ones found on the property of the complainant.
>
> Then, also, at the time we didn't know—We knew we had fingerprints, but there was no report back from the Mobile Crime Lab and we also confronted him with the fact that we possibly had some fingerprints.
>
> Then he asked Detective Tague if he could leave the room.
>
> Q Let me ask you: How did you initiate the conversation?
>
> A Well, I asked him—I took the composite and I asked Mr. Poole if he committed the assault and at the time, he said no.
>
> [Witness identifies the composite.]
>
> *    *    *    *    *    *
>
> A So, Detective Tague left the room at the request of Mr. Poole because he wanted to talk with just one of us, which was myself.
>
> And I asked him—I confronted him with the facts we had.
>
> And he asked me about, "well, what kind of bond would I receive?"
>
> .    .    .    .
>
> [Thus he had incriminated himself.]
>
> I then said to him, "If you did do it, tell me now and we will go down to the Sex Squad but," I said, "I don't want you to admit to anything that you didn't do."
>
> Then he said to me, "Okay, let's go to the Sex Squad."
>
> And I said, "Well, wait a minute." I said, "What are you telling me?"
>
> And he said, "Well, yes, I did it. I raped [the] secretary," [naming whose secretary she was].

At 10:30 p. m. Officer Kelly decided to take him to the Sex Squad Office in another part of Washington.[6]

Confronting him with the composite, telling him the victim most likely would identify him,[7] the physical taking of his pubic hairs, thus invading his personality, *Miranda, supra,* 384 U.S. at 460, 86 S.Ct. 1602, the representation to him that the hairs they had could possibly match those found on the property of the complainant, and stating that they

---

6. Shortly after arrival there he was forced to strip and put on a jail shirt.

7. At the original lineup the complainant identified another, but later identified a photograph of appellant at the grand jury and at trial. She also pointed out appellant during trial.

possibly had some fingerprints, thus confronting "him with the facts we had" —which they did not have [8]—were pressures obviously designed to, and did, exert compulsion to confess after appellant had repeatedly denied the rape according to the undisputed testimony. He was confronted with a hopeless situation grounded upon then unsupported factual representations, see footnote 8, *supra*, pressed upon him as demonstrating his guilt.

The situation above described is based upon undisputed evidence. Thus the confession, "I did it," was patently involuntary. It was not "the unfettered exercise of his own will." Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). This method of inducing a confession overcomes what assurance of voluntariness might arise from a previous waiver of rights. There is here clear and undisputed evidence of effective compulsion. It is not established that "the making of the statement was voluntary." Bram v. United States, *supra*, 168 U.S. at 549, 18 S.Ct. at 189, 42 L.Ed. 568.

The foregoing is by no means all the undisputed evidence. There is also no dispute that appellant was a heroin addict. Appellant claims that during the period he was held under interrogation he was suffering withdrawal pains and was promised help if he confessed. As to this matter Officer Szewczyk testified that while he was filling out an arrest form appellant told him of his addiction in response to the officer's inquiry. Officers Quantrelle and Waybright, who also engaged in the questioning, were also advised of his addiction. At the suppression hearing appellant testified that he confessed in order to obtain treatment for withdrawal which he said the

police promised. While they denied this, Officer Quantrelle admitted to advising appellant that help was available if needed when he would be brought to the central cell block after their interrogation. The officers denied seeing any physical indication of withdrawal pains during the interrogations, but Officer Szewczyk testified that when bringing appellant to the central cell block after the interrogation had been completed in the early morning appellant complained of withdrawal pains, and " . . . . I told him that it was up to the sergeant at the Central Cellblock to have him transported to the hospital for treatment." The officer also said, most significantly, "I informed the sergeant that he said he might be having withdrawals."

There is also the undisputed testimony of the nurse at the jail where defendant was received March 3.[9] She testified that on March 3 he was seen by the medical technical assistant who recorded he was "[i]n withdrawal, needle marks on forearm, Methadone 30 milligrams." She also testified that for six days he was on methadone detoxification. The medical records also show an entry by a doctor, apparently made on April 1: "perirectal aspect, heroin addiction."

The Government does not question the fact that appellant took heroin twice on the day of his arrest at approximately one o'clock in the morning and twelve hours later at one p. m. Heroin addiction is discussed in some detail in the recent decision of this court in United States v. Moore, 158 U.S.App.D.C. 375, 486 F.2d 1139, cert. denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973). I refer particularly to the statement in the dissenting opinion of Judge Wright, there supported, that withdrawal usually

---

8. No pubic hairs or fibers from appellant's clothing were found in the car or on the secretary or her clothing. Nor were there any identifying fingerprints found on the car, except for one clear fingerprint which was neither identified nor introduced at trial. A shirt was later taken from him to be sent to the FBI to see if fibers matched any found on the secretary's clothing.

9. It will be recalled he was under interrogation from about 8:30 p. m. March 2 until the early morning of March 3. The time of day he was received at the jail is not clear; there was testimony that usually the prisoners are brought from the court to the jail between 6 and 8 o'clock.

begins eight to ten hours after the last dose, with acute withdrawal symptoms being manifested within 48 to 72 hours. (486 F.2d at 1232.) It seems more than likely that during the period of his interrogation appellant was experiencing at least some of the throes of withdrawal, as he repeatedly testified, followed at some point by acute withdrawal pains when he was admitted to the infirmary the following day and given a dosage of methadone slightly larger than normal. This analysis gains credence from the fact that during the interrogation he was given coffee with plenty of sugar, cookies and candy. The need for sweets is symptomatic of withdrawal.

In weighing the effect of the interrogation to obtain a confession the court must consider that appellant may have been unusually vulnerable to compulsion either because of the pangs of withdrawal or the hope of avoiding them by confessing to gain needed help. Moreover, we are in the dark as to the effect of his undisputed addiction itself upon the issue of voluntariness of the confession.[10] Had appellant been taken without unnecessary delay before a magistrate, as required by Rule 5(a), F.R. Crim.P., this crucial matter, bearing heavily upon the issue of voluntariness, might have been resolved. The sum of the drug factor in this case, particularly the evidence bearing on the issue of withdrawal which is undisputed, cannot be ignored on the issue of voluntariness simply by an uncritical acceptance of the finding of the trial judge that appellant was not having withdrawal pains.

Another significant item, ignored by the court, is that after the detailed confession was written up and signed, defendant was permitted to talk to his mother on the telephone. The officer who heard this conversation testified he told his mother, "'I had to get it off my back' or 'get her off my back'—*something to that effect*."[11] The defendant's

mother testified that he said, "Mama, I had to tell them something. They are worrying me to death," and he said, "They are going to help me. . . . ." One can hardly avoid wondering whether the *"something like" "I had to get it off my back"* was in fact "I had to get *them* off my back," that is, as the mother said, "I had to tell them something. They are worrying me to death." And his statement that he said to his mother that "they are going to help me" gains credence by reason of the uncontestable evidence of addiction and the fact that he knew he faced withdrawal pains while in custody even if their actual timing is not definite.

There is one further item of evidence I wish to note. It appears that prior to any confession appellant at the precinct station requested permission to make a telephone call, but no call was made until he was permitted to use the telephone in the early hours of the morning, after signing the written confession.

I think it clear that compulsion of a character to render the confessions inadmissible was exerted upon appellant. Moreover, any doubts in that regard, under the standard of proof established by Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), should be resolved by exclusion of the confession, for we cannot place ourselves in his situation and accurately judge the subjective factors operative upon him due to the interrogation and its incidents, including his addiction and possible withdrawal pains, with help to come after confessing. And secret in-custody interrogation eludes accuracy of reproduction at a subsequent hearing.

Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms.

\* \* \* \* \* \*

The atmosphere carries its own badge of intimidation.

---

10. " . . . in reality heroin produces a tranquil, lethargic state in the user . . . . " United States v. Moore, *supra,* 486 F.2d at 1228 (dissenting opinion).

11. Emphasis added.

*Miranda, supra,* 384 U.S. at 448, 457, 86 S.Ct. at 1614, 16 L.Ed.2d 694. And see United States v. Wade, 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).[12]

I would hold the confessions inadmissible and remand for a new trial on evidence other than the confessions.

## IV

Apart from the foregoing based on the involuntariness of the confessions, they were inadmissible in my opinion on the independent ground spelled out in Adams v. United States, 130 U.S.App.D. C. 203, 399 F.2d 574 (1968). The defendants in that case were arrested in the afternoon for a particular attempted robbery. They were booked for that crime and put in several lineups without being presented to a magistrate for several days. One of them was identified at one of the lineups as having committed a different robbery. He was never prosecuted for the robbery for which he had been arrested, but on the trial for the one for which he was thus identified, the identification was admitted. This court (Burger, Wright and Mc-Gowan, JJ.) reversed. The opinion of Judge McGowan, in which Judge Wright concurred, states:

> The purpose of Rule 5(a) is to get persons lawfully arrested out of the police station and before a magistrate. At least in those cases where, as here, delay in presentment succeeds in turning up complicity in another and more serious crime than the one for which probable cause to arrest exists, the Rule can be made irrelevant by failing to prosecute the crime for which the arrest was made. This is not an available technique.

> On the precise facts shown by this record, we think the effect of Rule 5(a) is to convert, at least as of 4:00 P.M. on the afternoon of appellants' arrest, their continued detention at the police station into an unlawful arrest without probable cause in respect of the crime for which they were con-

12. The importance of the *Miranda* warnings fades on close examination, although in finding the confessions involuntary I have assumed a valid *Miranda* waiver. No significance attaches to the oral warning at the time of the arrest. His discarded weapon had been retrieved by one of the arresting officers and he was not being interrogated. And the last warning given at 11:30 p. m. with appellant's signature, is also of no significance because the initial confession had been obtained at 10:30 p. m.

Of the remaining warnings, the earlier one was given by Officer Joseph C. Quantrelle at 9:00 p. m. and bore appellant's pen-printed name. Appellant denied signing the waiver. If that alleged warning were critical a remand for expert testimony on handwriting would be necessary in my opinion. This signature has no resemblance whatever to his admitted signature, and Officer Szewczyk, the so-called "witness" to the waiver, testified that he did not in fact see appellant sign it. Furthermore, at 9 o'clock that evening the police had not begun to interrogate appellant about the rape.

The warning given at 10:35 p. m., "Time: 2235", was after appellant had orally confessed to Officer Kelly. The Government admits that Officer Kelly never advised appellant of his rights, and Officer Kelly according to his own testimony obtained the initial verbal confession at 10:30 p. m. On direct examination Officer Kelly said he observed others advising appellant of his rights. There is, however, no testimony of any of the officers who testified as to warning appellant of his rights except that I have discussed in this footnote, and none of their testimony is with respect to a warning subsequent to 9 o'clock until the 10:35 warning given after the oral confession.

There is thus no satisfactory proof of waiver at the time the interrogation switched to a different room by different officers, and from robberies to the rape. There is accordingly a serious question whether appellant was adequately warned of and waived his rights with respect to the interrogation about the rape. This was a matter unconnected with the arrest and previous interrogation. Under *Miranda, supra,* 384 U.S. at 479, 86 S.Ct. at 1630, such prior warnings as might here have been given did not satisfy the burden of the interrogators to assure the appellant a continuing opportunity to exercise his rights. "The opportunity to exercise these rights must be afforded to him throughout the interrogation." Even if we assume that the disputed 9 o'clock warning was given and rights waived, this episode was unrelated to the subsequent interrogation about the rape.

victed. It is not, thus, the precise scope of the *Mallory* exclusionary rule which is determinative here but, rather, the sweep of the general policy of excluding evidence gathered during a period of detention following upon an unlawful arrest. The applicable case among our precedents is Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465 (1959), in which this court held that fingerprints taken from one illegally arrested must be excluded, and where it espoused the principle that *anything* of evidentiary value produced by such detention is proscribed. (Footnote omitted.)

130 U.S.App.D.C. at 206, 399 F.2d at 577. In his concurrence, Judge Burger, now our Chief Justice, states:

Necessary delay can reasonably relate to time to administratively process an accused with booking, fingerprinting and other steps and sometimes even to make some limited preliminary investigation into his connection with the crime for which he was arrested, especially when it is directed to possible exculpation of the one arrested. However, when delay of presentment to the magistrate is for the purpose of investigation of *other* crimes, then there is no doubt that the "delay" has become "unnecessary."

130 U.S.App.D.C. at 208, 399 F.2d at 579.

As in *Adams*, Rule 5(a) was plainly violated in the present case.

In his concurring opinion in *Adams*, Judge Burger did not accept the "divisible arrest" theory of the majority. In view, however, of *Wade, supra,* he applied the *Mallory* exclusionary rule to the lineup identification:

Now that the right to counsel is an integral part of the lineup procedure, the warnings that are given at presentment and the opportunity to have counsel appointed are highly relevant to the lineup situation. See Fed.R.Crim.P. 5(b); 18 U.S.C. § 3006 A (b) (1964). Since the *Mallory* rule

was a response to the protections afforded by prompt presentment, it is appropriately applied to the lineup situation in the wake of *Wade*.

130 U.S.App.D.C. at 209, 399 F.2d at 580.

Under the views of both the majority and Judge Burger the exclusion of the lineup identification was based on the fact that it was obtained as the consequence of illegal detention, due, in the majority's view, to the unlawful arrest without probable cause for the robbery for which he was tried, and, in Judge Burger's view, due to the unlawfulness of the detention in violation of Rule 5(a). In appellant's case the confession was obtained during the illegal detention in violation of Rule 5(a) as was the lineup identification in *Adams*, and, as in *Adams*, it was for a different crime from that which led to the arrest. Appellant was not arrested for rape prior to the oral confession to Officer Kelly. After that, and not before, Officer Kelly directed that appellant be booked for the rape. It would seem logical to apply to a confession to another crime obtained during such illegal detention the same rule that is applied to an identification with respect to another crime. When an arrest for one offense on probable cause is utilized to detain a suspect indefinitely, for the purpose of investigating by lineups, as in *Adams*, or by in-custody interrogation, as here, with respect to other crimes, it is the unlawfulness of the detention which leads to the resulting evidence. This is so whether that unlawfulness is attributed to no probable cause for arrest for the other crime or to violation of Rule 5(a). We cannot escape the duty of insisting that in the administration of criminal justice evidence be obtained by lawful means.

It may be contended now, however, with reference to Judge Burger's concurring opinion in *Adams*, that the detention of the appellant had not become unlawful under Rule 5(a), although in *Adams* Judge Burger held a similar detention was unlawful. This contention

would rest upon the views expressed by this court subsequent to *Adams* that a *Miranda* waiver is a waiver also of the obligation of the arresting authorities to comply with Rule 5(a). The opinions of this court in Frazier v. United States, 136 U.S.App.D.C. 180, 419 F.2d 1161 (1969), and Pettyjohn v. United States, 136 U.S.App.D.C. 69, 419 F.2d 651 (1969), are to that effect. I respectfully urge that this is a mistaken position, and should be reconsidered, for it is inconsistent with the position of the Supreme Court in *Miranda*, as appears from the following portion of the opinion in that case, which the *Frazier* and *Pettyjohn* opinions seem to have overlooked:

> Because of the adoption by Congress of Rule 5(a) of the Federal Rules of Criminal Procedure, and this Court's effectuation of that Rule in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), we have had little occasion in the past quarter century to reach the constitutional issues in dealing with federal interrogations. These supervisory rules, requiring production of an arrested person before a commissioner "without unnecessary delay" and excluding evidence obtained in default of that statutory obligation, were nonetheless responsive to the same considerations of Fifth Amendment policy that unavoidably face us now as to the States. In *McNabb*, 318 U.S., at 343–344, 63 S.Ct. 608, 614, and in *Mallory*, 354 U.S., at 455–456, 77 S.Ct. 1356, we recognized both the dangers of interrogation and the appropriateness of prophylaxis stem-

ming from the very fact of interrogation itself.[32]

> 32. Our decision today does not indicate in any manner, of course, that these rules can be disregarded. When federal officials arrest an individual, they must as always comply with the dictates of the congressional legislation and cases thereunder. See generally, Hogan & Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Geo.L.J. 1 (1958).

384 U.S. at 463, 86 S.Ct. at 1622.

It hardly need be added that none of the *Miranda* warnings given in the present case advised appellant of his right to be taken without unnecessary delay before a magistrate. Not only was that right not waived, but a *Miranda* waiver, applicable to state prosecutions, leaves intact the application in federal cases of Rule 5(a) and the decisions effectuating its provisions.

V

It seems quite clear that the confessions, obtained in the course of a violation of Rule 5(a), would therefore be inadmissible for that reason alone under the *Mallory* rule but for the erroneous waiver ruling of this court above discussed, unless the enactment subsequent to *Miranda* of 18 U.S.C. § 3501[13] now precludes application of the *Mallory* rule. Section 3501 became effective June 19, 1968, two days before *Adams* was decided. The *Adams* court, however, did not consider section 3501, although it was mentioned without elaboration in the Government's petition for rehearing, which was denied without opinion September 9, 1968.

In my view there are serious questions whether section 3501 can be sustained as a modification of the *Mallory* rule—questions of constitutional substance as indicated by the *Miranda* reference to the Rule. But since I think the convictions with respect to the rape

13. The relevant provision of section 3501 in this connection is contained in section 3501(c) that a confession "shall not be inadmissible solely because of delay in bringing [the person arrested and in custody] before a magistrate . . . if such confession is found by the trial judge to have been made voluntarily . . . and if such confession was made or given by such person within six hours immediately following his arrest or other detention. . . ."

and its related charges should not be sustained on grounds independent of the *Mallory* rule, I need not pursue my resolution of those questions. There are, however, several additional comments I wish to make with respect to the present opinion of the court:

I have no disagreement with the majority as to the seriousness of the crime or the strength of evidence of appellant's guilt apart from the confessions. The court does not suggest, however, application of the harmless error rule. The court holds there was no error in the admission of the confessions. In that situation the seriousness of the crime and the strength of other evidence of guilt may not properly be considered on the issue of voluntariness of the confessions. The Supreme Court has been very clear as to this. In Davis v. North Carolina, 384 U.S. 737, 739, 86 S.Ct. 1761, 1763, 16 L.Ed.2d 895 (1966), where the voluntariness of the confession was to be determined in a collateral attack upon the conviction the Court said:

> We are not called upon in this proceeding to pass on the guilt or innocence of the ˙petitioner of the atrocious crime that was committed. Nor are we called upon to determine whether the confessions obtained are true or false. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

In Rogers v. Richmond the matter is carefully and fully explained by Mr. Justice Frankfurter for the Court.

Moreover, the serious crime situation among the young does not excuse coercive in-custody interrogation of a particular youth under arrest. Quite the opposite is the case, as pointed out in the famous opinion for the Court of Mr. Justice Black in Chambers v. Florida, *supra*, in 1940, and that of Mr. Justice Douglas for the Court in later years in Gallegos v. Colorado, 370 U.S. 49, 53, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962). The Court there cites the earlier case and goes on to note, "[t]he youth of the suspect was the crucial factor in Haley v. Ohio, . . . [332 U.S. 596, 599–600, 68 S.Ct. 302, 92 L.Ed. 224 (1947)]", adding, "[t]he fact that petitioner was only 14 years old puts this case on the same footing as Haley v. Ohio, *supra*," even though there was "no evidence of prolonged questioning." 370 U.S. at 53, 54, 82 S.Ct. at 1212. The point is, simply, that the youth of an arrestee weighs against voluntariness of his confession, notwithstanding the prevalence of crime among the young.

For these additional reasons the court in my opinion is not now following the proper standards governing appellate review of the issue of voluntariness. My position in this regard also gains strength from the several references by the majority to appellant's capacity, which, though relevant, is not a criterion for determining the issue of voluntariness.

The majority accepts as fact all the testimony of the officers to which the court refers, whether or not disputed; yet the trial judge did not resolve these factual disputes in their details at the suppression hearing, and I do not suggest the judge was required to do so. He concluded generally that the confession was "freely given without coercion of any kind," and that appellant during the custodial interrogation was not suffering withdrawal pains.[14] My conclusion that the confesssions were involuntary rests upon undisputed facts, reinforced by circumstances which may be in dispute. In contrast the majority reaches the opposite conclusion by accepting disputed facts as to which the trial court made no specific finding, disregards the inherently coercive character of secret, in-custody interrogation pointed out in *Miranda, supra*, 384 U.S. at 448, 457, 86 S.Ct. 1602, 16 L.Ed.2d 694, disregards the reference by the Su-

---

14. The majority finds that appellant had knowingly and voluntarily waived his rights to remain silent and to counsel. Although in my footnote 12 above I give reasons for believing the importance of the *Miranda* waivers is weakened on close examination, I have considered the voluntariness issue on the assumption the *Miranda* waivers were valid.

preme Court there to the fact that privacy results in a gap in our knowledge as to what goes on in an interrogation room,[15] and accepts the testimony of the officers not as their testimony but as fact.[16]

That the court has departed from the proper standard of review as to the voluntariness of the confession is further demonstrated by the court's discussion of the taking of the pubic hair sample and the accompanying circumstances. The majority states that the officers had the right thus to invade his personality, citing Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) and United States v. Sheard, 154 U.S.App.D.C. 9, 473 F.2d 139, cert. denied, 412 U.S. 943, 93 S.Ct. 2784, 37 L. Ed.2d 404 (1973). In *Schmerber* the Court upheld as against the claim of violation of the Fifth Amendment privilege and the Fourth Amendment protection from unreasonable search and seizure, the admission in evidence of an analysis of blood taken from an individual suspected of drunkenness. In *Sheard* the question was as to the admissibility of a benzidine test to the pubic area of the accused, which this court upheld. In the present case no issue is raised as to the admissibility of any evidence respecting pubic hairs, and no contention is made the officers were without legal right in obtaining them. What is contended, and, respectfully, cannot in reason be denied, is that the complete domination thus assumed over appellant, with its

special invasion of his personality, was a significant factor to be considered in determining the issue of voluntariness, as was the stripping of Bram, the mature second mate on a freighter, in determining the issue of voluntariness of his incriminating statement. Bram v. United States, 168 U.S. 532, 561–562, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

## VI

The concurring opinion of Judge Leventhal states, "The fact that we place our ruling on a waiver by appellant is not to be taken as a concession or ruling that his confession would have been inadmissible under *Mallory*." The suggestion is that appellant's detention under interrogation from shortly after 8:30 p. m. until nearly 1:30 a. m. was not "unnecessary delay" within the meaning of Rule 5(a), F.R.Crim.P. and *Mallory*, a position not advanced by the Government. The fact is the delay in this case before the written confession was signed was actually longer than the period of interrogation which preceded the confession in *Mallory*, the case which gave rise to the Rule. Furthermore, the possible unavailability of a magistrate made no difference to the Supreme Court in *Mallory*. This view in the concurring opinion, therefore, departs from *Mallory* and from the application in this jurisdiction of the Rule for which the case stands. See, Greenwell v. United States, 119 U. S.App.D.C. 43, 336 F.2d 962 (1964); Spriggs v. United States, 118 U.S.App.

15. To the same effect see United States v. Wade, 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Ashcraft v. Tennessee, 322 U.S. 143, 152, 64 S.Ct. 921, 88 L. Ed. 1192 (1944), and Gallegos v. Colorado, supra, 370 U.S. at 50–51, 82 S.Ct. at 1211, where it is said:
Confessions obtained by "secret inquisitorial processes" (Chambers v. Florida, 309 U.S. 227, 237, 60 S.Ct. 472, 84 L.Ed. 716) are suspect, . . . "always evidence concerning the inner details of secret inquisitions is weighted against an accused. . . ."

16. This approach of the court also leads to several particular factual conclusions which in my opinion are unwarranted. Thus it is

said that appellant "drew" his gun as though he threatened the officer because when being pursued he turned toward the officer, rather than interpreting the situation as a discarding of the gun as he ran. It is also said that he signed one of the *Miranda* warnings and consent forms by printing his name although this he not only denies this signing, but the alleged signature has no resemblance whatever to his admitted signature and the officer who signed as "witness" testified that he did not in fact "witness" the signing. Again, the majority states appellant "says he was frightened" when arrested. As I have pointed out my reference to the frightened condition of appellant is based on the arresting officer's own testimony, who said he "was visibly shaken. . . ."

D.C. 248, 335 F.2d 283 (1964) [17]; Naples v. United States, 113 U.S.App.D.C. 281, 307 F.2d 618 (en banc, 1962). The two cases from this jurisdiction cited by the concurring opinion in its footnote 3 give no support to its position. In Lockley v. United States, 106 U.S.App.D.C. 163, 270 F.2d 915 (1959), the confession came fifteen minutes after the arrest and in Washington v. United States, 103 U.S.App.D.C. 396, 258 F.2d 696 (1958), within twenty minutes.

The suggestion of Judge Leventhal's concurring opinion that, since appellant's arrest at night prevented judicial presentment under Rule 5(a) until the next morning, a confession obtained by interrogation during this delay might not be inadmissible under *Mallory* envisages the possibility that arrests could be made at night followed if need be by night-long, secret interrogation to obtain a confession, in stark derogation of the obligation under Rule 5(a). Although dissenting for other reasons in Spriggs v. United States, *supra*, Judge Burger, now Chief Justice, stated the following course to be followed under *Mallory* when a magistrate is not available at night:

> The heart of the problem, as I see it, is that once it can fairly be said that there is probable cause to charge a detained person, he is not to be interrogated. He may be held to await the reasonable availability of a judicial officer. If the arrest occurs at midnight, it is absurd to talk of calling a Judge or Commissioner out of his bed to conduct a hearing which may take only 10 minutes and can as readily be held in regular business hours the following morning. Moreover, police officers or other witnesses may not be available outside regular business hours. But during the interval while the detained person is awaiting presentment before a judicial officer, substantive interrogation must, under the controlling authorities, be suspended. It is not delay per se which is prohibited by *Mallory*; it is the interrogation process which is restricted.

118 U.S.App.D.C. at 253, 335 F.2d at 288.

### VII

The problem in this case with respect to Rule 5(a), aside from the possible application of 18 U.S.C. § 3501, already referred to in my opinion,[18] does not turn on whether there was a violation of Rule 5(a)—such a violation clearly appears unless compliance with Rule 5(a) was waived—but upon whether the *Miranda* waivers constituted a waiver of the obligation of compliance by the officers with Rule 5(a), as held in *Pettyjohn, supra*. The majority relies on this waiver theory to solve the complexities of the *Mallory* issues to which Judge Leventhal refers. The difficulty with this reliance, however, is the *Miranda* opinion itself. See the quotation from the opinion, 384 U.S. at 463, 86 S.Ct. 1602, 16 L.Ed.2d 694, *supra*. There the Court explicitly preserves the vitality in federal cases of Rule 5(a) and the cases thereunder, citing *Mallory*. The Supreme Court was careful to surround a *Miranda* waiver of rights with safeguards designed to protect its authenticity. The opinion is largely devoted to these safeguards. In preserving at the same time in federal cases the vitality of Rule 5(a) and *Mallory*, the Court clearly excluded Rule 5(a) and *Mallory* from the embrace of a *Miranda* waiver applicable to state cases. Such a waiver and the reaffirmation of Rule 5(a) and *Mallory* are mutually exclusive. In neither *Pettyjohn* nor in *Frazier* opinion is this situation noted. *Miranda*, I respectfully

---

17. I should supplement somewhat Judge Leventhal's description of *Spriggs* by pointing out that the form-filling process there was so protracted as to amount to "unnecessary delay." Moreover, *Spriggs* in no way departs from the rule, so fully explained in

Rogers v. Richmond, *supra*, that the admissibility of confessions does not depend upon their reliability but upon the circumstances under which they were obtained.

18. See my footnote 13, *supra*, and text following.

suggest, cannot be held silently to have destroyed what it explicitly preserves.

I respectfully dissent on the ground that affirmance of the rape and its associated convictions rests upon confessions which were inadmissible. I add that, as I have noted from time to time, the majority position in my opinion rests substantially upon an erroneous standard of appellate review of the issue of voluntariness of the confessions.

While under the views I have expressed justice may still remain to be done in this case, I think it has not yet been accomplished consistently with the Fifth Amendment privilege against compelled self-incrimination, all else aside.